# EXHIBIT 1

Delaware.gov | Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

**HOME**

| | Entity Details |
|---|---|

THIS IS NOT A STATEMENT OF GOOD STANDING

| File Number: | **6502504** | Incorporation Date / Formation Date: | **12/15/2021** (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | **FAES & CO US CORP** | | |
| Entity Kind: | **Corporation** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| Name: | **NORTHWEST REGISTERED AGENT SERVICE, INC.** | | |
|---|---|---|---|
| Address: | **8 THE GREEN, STE B** | | |
| City: | **DOVER** | County: | **Kent** |
| State: | **DE** | Postal Code: | **19901** |
| Phone: | **302-581-4070** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.
Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]          [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

# EXHIBIT 2

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

**HOME**

| Entity Details |
| --- |

THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
| --- | --- | --- | --- |
| File Number: | **6760271** | Incorporation Date / Formation Date: | **4/26/2022** (mm/dd/yyyy) |
| Entity Name: | **FAES & CO DIGITAL MINING INC.** | | |
| Entity Kind: | **Corporation** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
| --- | --- | --- | --- |
| Name: | **NORTHWEST REGISTERED AGENT SERVICE, INC.** | | |
| Address: | **8 THE GREEN, STE B** | | |
| City: | **DOVER** | County: | **Kent** |
| State: | **DE** | Postal Code: | **19901** |
| Phone: | **302-581-4070** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]                    [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map   |   privacy   |   about this site   |   contact us   |   translate   |   delaware.gov

# EXHIBIT 3

 Positive

As of: January 25, 2023 9:01 PM Z

## *Flores v. Strauss Water, Ltd.*

Court of Chancery of Delaware

June 22, 2016, Submitted; September 22, 2016, Decided

C.A. No. 11141-VCS

**Reporter**

2016 Del. Ch. LEXIS 145 *

CHAPTER 7 TRUSTEE CONSTANTINO FLORES on behalf of the Estates of Esio Beverage Company, LLC, Esio Holding, Company, LLC, and Esio Franchising, LLC, Plaintiff, v. STRAUSS WATER LTD., Defendant.

**Notice:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

## Core Terms

License, technology, loan agreement, arbitration, tortious interference, allegations, promises, convert, business relationship, estoppel, parties, written contract, contracts, fair dealing, rights, products, equity investment, contradict, interfered, beverage, motion to dismiss, oral promise, terms, implied covenant of good faith, provisions, tortiously, well-pled, infusion, default, invest

## Case Summary

### Overview

HOLDINGS: [1]-In this fraud action, plaintiff's claims that it justifiably relied upon extra-contractual promises and representations and that defendant breached the implied covenant of good faith and fair dealing were belied by the clear terms of the loan agreement and warrant; [2]-Plaintiff's claim for tortious interference with contract was not well-pled because plaintiff sought to vary the terms of its written contracts with defendant in order to state an extra-contractual claim; [3]-Plaintiff pled facts sufficient to allow a reasonably conceivable inference that defendant tortiously interfered with plaintiff's prospective business relationship with a potential licensing partner.

### Outcome

Defendant's motion granted in part and denied in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN1*[ ] **Motions to Dismiss, Failure to State Claim**

The governing pleading standard in Delaware to survive a motion to dismiss is reasonable conceivability. Under this standard, Delaware courts will accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof. The court will not, however, accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor of the non-moving party.

Business & Corporate Compliance > ... > Contract Formation > Contracts Law > Contract Formation

Contracts Law > Contract Interpretation

*HN2*[ ] **Contracts, Contract Formation**

Delaware is a contractarian state. As such, a party who enters into a contract governed by Delaware law will be

Jacob Tyson

charged with knowledge of the contents of the instrument and will be deemed to have knowingly agreed to the plain terms of the instrument absent some well-pled reason to infer otherwise. And this same party will face an uphill climb when it seeks to prosecute claims that it relied on promises that are explicitly contradicted by its own clear and unambiguous written contract.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements

Torts > ... > Fraud & Misrepresentation > Negligent Misrepresentation > Elements

*HN3*[ ] **Consideration, Promissory Estoppel**

Claims for fraud, fraudulent inducement, negligent misrepresentation, promissory estoppel and estoppel all require a plaintiff to plead that he justifiably or reasonably relied on the defendant's promise.

Contracts Law > Contract Interpretation

*HN4*[ ] **Contracts Law, Contract Interpretation**

It is unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement.

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements

*HN5*[ ] **Actual Fraud, Elements**

In order to state a claim for fraud or fraudulent inducement, plaintiff must plead with particularity the following elements: (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

Torts > ... > Fraud & Misrepresentation > Negligent Misrepresentation > Elements

*HN6*[ ] **Negligent Misrepresentation, Elements**

To state a claim for negligent representation, a plaintiff must plead that (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information. Negligent representation is essentially a species of common law fraud with a lesser state of mind requirement.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel

Evidence > Burdens of Proof > Clear & Convincing Proof

*HN7*[ ] **Consideration, Promissory Estoppel**

To state a claim for promissory estoppel, a plaintiff must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promise; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.

Contracts Law > ... > Estoppel > Equitable Estoppel > Elements of Equitable Estoppel

*HN8*[ ] **Equitable Estoppel, Elements of Equitable Estoppel**

To prevail on a claim of equitable estoppel, a plaintiff must show (1) conduct by the party to be stopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of

discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other, and (4) action or forbearance by the other party amounting to a change of status to his detriment.

Contracts Law > Contract Interpretation > Parol Evidence

*HN9*[ ] **Contract Interpretation, Parol Evidence**

Delaware's parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of the contract. Thus, even if a provision is mistakenly left out of a document, the parole evidence rule precludes the court from considering the alleged oral promises made before the execution of a written contract. The court, instead, must be guided by what the parties say in their written contracts; it cannot be distracted by misguided allegations of fraud or estoppel, however passionately they might be pled.

Torts > ... > Compensatory Damages > Types of Losses > Economic Losses

*HN10*[ ] **Types of Losses, Economic Losses**

The economic loss doctrine allows a party to recover in negligence only if losses are accompanied by bodily harm or property damages.

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

*HN11*[ ] **Contract Interpretation, Good Faith & Fair Dealing**

The implied duty of good faith and fair dealing applies only when it is clear from the underlying contract that the contracting parties would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter. It follows, then, that the implied covenant of good faith and fair dealing does not apply when the contract speaks directly to the alleged gap in the contract the implied covenant has been proffered to fill.

Torts > ... > Contracts > Intentional Interference > Elements

*HN12*[ ] **Intentional Interference, Elements**

The typical claim for tortious interference arises when the defendant wrongfully prevents a third party from performing a contract. This cause of action requires (1) a valid contract, (2) about which the defendants have knowledge, (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract, (4) without justification and (5) which causes injury.

Torts > ... > Commercial Interference > Contracts > Intentional Interference

*HN13*[ ] **Contracts, Intentional Interference**

One who intentionally and improperly interferes with the performance of a contract between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Torts > ... > Contracts > Intentional Interference > Elements

*HN14*[ ] **Intentional Interference, Elements**

A plaintiff cannot prevail on a tortious interference with contract claim if the essence of his complaint is that the defendant refused to deal when he had no obligation to deal, or that the defendant's alleged tortious conduct amounted to nothing more than the defendant acting within its contractual rights.

Torts > ... > Contracts > Intentional Interference > Elements

*HN15*[ ] **Intentional Interference, Elements**

A party cannot claim a tortious interference with contract when there has been no breach of that contract.

Contracts Law > Contract Interpretation > Good

Faith & Fair Dealing

**HN16**[⬇]  **Contract Interpretation, Good Faith & Fair Dealing**

While it is true that the implied covenant of good faith and fair dealing inheres to every Delaware contract, it cannot be employed to rewrite an otherwise comprehensive written contract between the parties. Rather, the implied covenant requires parties to a contract only to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. The court will not impose the implied duty of good faith and fair dealing on a party to require that the party actually improve the deal the plaintiff struck in the first instance.

Torts > ... > Business Relationships > Intentional Interference > Elements

**HN17**[⬇]  **Intentional Interference, Elements**

To plead a claim for tortious interference with prospective business relations, a plaintiff is required to allege facts that demonstrate (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation and (d) damages. In addition, plaintiff is required to plead that defendant's alleged interference was somehow improper. There can be no improper interference where the defendant acted either (1) affirmatively within its contractual rights or (2) by omission where it had no contractual obligation to deal.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Torts > ... > Business Relationships > Intentional Interference > Elements

**HN18**[⬇]  **Motions to Dismiss, Failure to State Claim**

While a plaintiff must ultimately prove the reasonable probability of a business opportunity, the existence of such a business expectancy is a question of fact not suitable for resolution on a motion to dismiss.

Torts > ... > Business Relationships > Intentional Interference > Elements

**HN19**[⬇]  **Intentional Interference, Elements**

Delaware embraces a "but for" causation paradigm where proximate cause exists when an act or omission in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Significant Relationships

**HN20**[⬇]  **Choice of Law, Significant Relationships**

When determining which sovereign's laws to apply when laws potentially conflict, Delaware courts use a two-part test: First, the court determines whether there is an actual conflict of law between the proposed jurisdictions. If there is a conflict, the court determines which jurisdiction has the most significant relationship to the occurrence and the parties based on the factors. Where the result would be the same under both sovereign's laws, there is a "false conflict" and the court should avoid the choice-of-law analysis altogether.

Business & Corporate Compliance > ... > Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses

**HN21**[⬇]  **Contract Conditions & Provisions, Forum Selection Clauses**

t is well settled law in Delaware that choice of forum provisions are enforceable.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Arbitration

Business & Corporate Compliance > ... > Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN22**[⬇]  **Alternative Dispute Resolution, Arbitration**

As a general rule, a court will compel parties to submit

to arbitration only where they have agreed to arbitrate as a matter of contract. A non-signatory will be bound by an arbitration clause within a contract only if traditional principles of contract and agency law equitably confer upon that party signatory status with regard to the underlying agreement. A non-signatory may be found to have embraced a contract (1) where the non-signatory directly, rather than indirectly benefitted from the agreement during the course of the agreement's performance; (2) where the non-signatory consistently maintains that other provisions of the same contract should be enforced to benefit him; or (3) where the non-signatory sues to enforce the provisions of a contract that it likes, while simultaneously disclaiming the provisions that it does not.

Contracts Law > Third Parties > Beneficiaries

**HN23**[ ] **Third Parties, Beneficiaries**

Under the third-party beneficiary theory, the third-party must directly benefit from the agreement.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Arbitration

Contracts Law > ... > Estoppel > Equitable Estoppel > Elements of Equitable Estoppel

Business & Corporate Compliance > ... > Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN24**[ ] **Alternative Dispute Resolution, Arbitration**

The doctrine of equitable estoppel may bind a party to an arbitration agreement even where it is a non-signatory if the non-signatory by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to its detriment. The party who claims that another is bound to an arbitration clause by estoppel must demonstrate that (i) it lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) it reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) it suffered a prejudicial change of position as a result of their reliance. The estoppel theory breaks down when the party seeking to compel arbitration is a party to another

agreement with the party whom it seeks to compel to arbitrate, that other agreement is central to the dispute and it contains an express forum selection provision. Under these circumstances, the moving party will be precluded from claiming that it reasonably expected it would be able to compel arbitration notwithstanding the contrary forum selection provision to which it agreed.

**Counsel:** **[\*1]** Kathleen M. Miller, Esquire of Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware, and Todd Kartchner, Esquire, Amy Abdo, Esquire, and Seth Schuknecht, Esquire of Fennemore Craig, P.C., Phoenix, Arizona, Attorneys for Plaintiff.

Philip A. Rovner, Esquire and Jonathan A. Choa, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, and Susan M. Freeman, Esquire and Justin J. Henderson, Esquire of Lewis Roca Rothgerber Christie LLP, Phoenix, Arizona, Attorneys for Defendant.

**Judges:** SLIGHTS, Vice Chancellor.

**Opinion by:** SLIGHTS

# Opinion

### MEMORANDUM OPINION

SLIGHTS, Vice Chancellor

Constantino Flores, Chapter 7 bankruptcy trustee for the estates of Esio Beverage Company, LLC, Esio Holding Company, LLC and Esio Franchising, LLC (collectively "Esio"), alleges in a Verified Amended Complaint ("Complaint") that Strauss Water Ltd. masterminded a fraudulent and otherwise tortious scheme to drive Esio into financial ruin so that it could seize as collateral to certain defaulted loan covenants Esio's valuable technology licenses, clients and business opportunities. It is alleged that Strauss accomplished this scheme by making a series of intentional misrepresentations that induced Esio to rely on Strauss as its sole **[\*2]** source for the capital infusion it desperately needed, then declining to supply that capital infusion after Esio had reached a proverbial point of no return. Esio ultimately was forced to declare bankruptcy and its trustee thereafter filed this action to recover damages incurred due to Strauss's allegedly wrongful conduct.

Flores has brought claims on behalf of the Esio

bankruptcy estate against Strauss[1] for (I) fraud, (II) fraudulent inducement, (III) negligent misrepresentation, (IV) breach of the implied covenant of good faith and fair dealing, (V) breach of oral promise, (VI) promissory estoppel and (VII) estoppel. Each of these claims generally relate to Strauss' alleged failure to follow through with its promises to infuse Esio with a $30 million equity investment. Esio also has alleged that Strauss tortiously interfered with certain of Esio's existing contracts (VIII) and prospective business relationships (IX) as part of its scheme to accelerate Esio's demise. Finally, Esio seeks to compel Strauss to arbitrate these claims (X) per contractual provisions, allegedly binding upon Strauss, that mandate arbitration. Strauss has moved to dismiss the Complaint in its entirety for failure **[*3]** to state a claim upon which relief can be granted under *Court of Chancery Rule 12(b)(6)*.

After carefully reviewing the Complaint, I conclude that Esio has failed to state claims for fraud, fraudulent inducement, negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, "breach of oral promise," promissory estoppel or estoppel, as all of these claims contradict the clear and unambiguous terms of the written contracts between the parties. Esio also has failed to state a claim for tortious interference with contract as all of the alleged "improper" acts undertaken by Strauss were expressly permitted by the parties' contracts and all of Strauss' alleged "improper" omissions involved matters where Strauss was under no duty to act.

Esio has, however, pled facts sufficient to allow a reasonably conceivable inference that Strauss tortiously interfered with Esio's prospective business relationship with a potential licensing partner. Defendant's alleged justifications for its actions with respect to this potential Esio business partner, while possibly **[*4]** meritorious, are fact intensive and not appropriate for disposition on a motion to dismiss.

Finally, Esio's effort to compel arbitration fails as a matter of law. Strauss cannot be bound to an arbitration agreement to which it is not a party and, in any event, the claims Esio has brought here arise under a contract that contains an exclusive Delaware forum selection clause.

# I. BACKGROUND

In considering this motion to dismiss, I have drawn the facts from the "well-pled allegations of the complaint, . . . the documents incorporated into the complaint by reference, and . . . judicially noticed facts."[2]

## A. The Parties and Relevant Non-Parties

Esio filed for bankruptcy protection in 2013, and Flores was appointed the trustee of the bankruptcy estate. Esio had been in the beverage industry offering products that included water-based beverages and beverage dispensing machines. Its principal place of business was in Arizona.

Strauss is an Israeli limited company with its principal place of business in Tel Aviv. A portion of Strauss' business involves the sale of drinking water in the worldwide market. Non-party Rami Ronen was the Chief Executive Officer of Strauss.

## B. Esio Pursues [*5] an Infusion of Capital

In 2005, Esio entered into a development agreement and exclusive license with Intelligent Coffee Company, LLC ("ICC"), an Arizona limited liability company that, *inter alia*, developed products for the beverage industry. Under the license agreement, ICC gave Esio an exclusive license to ICC's beverage dispensing technology.

In 2011 Esio found itself strapped for cash and began to look for an infusion of capital in the range of $20 million—$30 million. It had developed products and technology, including the ICC licensed technology, and needed additional capital to promote the products and exploit its technology and intellectual property.

Esio approached Strauss in August, 2011 regarding a possible investment. Strauss expressed interest in partnering with Esio as a means to enter the United States market. It was also very interested in the beverage dispensing technology Esio had licensed from ICC. Esio, in turn, saw Strauss as an attractive partner both because it was well-resourced and because it had developed a specialized carbonation technology that

---

[1] For the sake of clarity and brevity, I will hereafter refer to claims brought by Flores on behalf of the Esio bankruptcy estate as Esio's claims.

[2] *Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007)* (footnotes omitted).

Esio thought would fit well with its new products.

During this time, with full disclosure to Strauss, Esio actively **[*6]** explored other sources of capital. As of September, 2011, Esio had raised over $1 million that it was holding in escrow for a possible reverse merger and private placement.[3]

Esio was clear that it was looking to Strauss to make an investment in Esio; it was not seeking and did not want debt financing. Strauss assured Esio that it "was not interested in being a bank that would simply lend Esio money."[4] Throughout the balance of 2011 Esio provided Strauss with extensive due diligence, including information about its existing and anticipated future customers, its marketing strategies, partners, suppliers, and client contacts. During this process Esio apprised Strauss of its contract with Walmart® that would enable Esio to place its products in more than two thousand Walmart® stores. Esio had planned to pay for the marketing of the Walmart® release with money invested by Strauss.

## C. The Parties Negotiate the Terms of their Relationship—The Oral Promises

During a meeting in Israel in November 2011, Esio advised Strauss that it was looking for an equity investment of $30 **[*7]** million. Strauss agreed. It proposed that it would initially extend a $5 million dollar "bridge loan" so that Esio would have access to cash quickly in order to satisfy its obligations to Walmart®.[5] Strauss committed that it would convert this initial loan into an equity investment when it completed the balance of its investment ($25 million). Ronen allegedly represented that structuring the initial $5 million investment as a loan was a "formality [that allowed a] faster way to get Esio the money it needed" because Strauss board approval would not be required.[6] Esio agreed to the loan but only subject to the "express understanding that the loan would be converted to equity . . . and the second investment would follow."[7]

After Esio and Strauss orally agreed to the structure and amount of Strauss' investment, Strauss demanded that Esio put aside its plans to pursue a public offering and return the money it had raised in contemplation of "using a reverse merger to raise additional capital."[8] Strauss also caused Esio to create a holding company structure, alter its business plan, and reserve the equity ownership units that were to be issued to Strauss. Esio agreed **[*8]** to take these steps because Strauss had agreed to make a sizable investment and Esio was in dire need of capital.

In December 2011, Strauss required Esio to meet with Ofra Strauss, the Chairwoman of Strauss' parent company. Strauss representatives allegedly told Esio that if the deal was approved by Ofra, then the equity investment would be assured.[9] Less than forty-eight hours after Esio's meeting with Ofra, Strauss informed Esio that Ofra had approved the entire deal. In April 2012, however, Esio learned from Ronen, allegedly for the first time, that the $25 million equity investment would require approval from both Strauss and its parent company—approvals Esio had believed were already in place.

Esio and Strauss executed a Term Sheet on January 18, 2012.[10] The Term Sheet outlined the terms of a "mutual licensing of IP."[11] It further provided for Strauss and Esio to enter into a convertible loan whereby Strauss would loan Esio $5 million that would be collateralized by Esio's intellectual property rights and Esio products. When discussing the loan, the Term Sheet laid out rights that Strauss would **[*9]** have "during the period until the Loan is either converted or repaid."[12] Strauss was to have the "option, to be exercised not later than December 31, 2013, to convert the Loan into shares of Esio."[13] If Esio had repaid any portion of the principal of the loan, then Strauss' option to convert the full amount of the loan would be subject to the revised balance of the loan.

---

[3] The Complaint does not disclose the identity of Esio's potential merger partner.

[4] Verified Amended Complaint ("Compl.") ¶ 18.

[5] Id. ¶ 26.

[6] Id. ¶ 27.

[7] Id. ¶ 28.

[8] Id. ¶ 34.

[9] I refer to Ms. Strauss by first name to avoid confusion; no disrespect is intended.

[10] Id. ¶ 41.

[11] Id. Ex. 2.

[12] Id.

[13] Id.

Strauss also was to have the

> option . . . to make additional equity investment in Esio of an additional $25 million based on a pre-money valuation of $45 million, subject to Esio meeting certain performance targets . . . . If Esio does not meet the performance targets . . . Strauss Water will receive additional shares of equity, which shall serve the purpose of reducing the pre-money valuation.[14]

The Term Sheet provided that it, along with the license agreements and convertible loan agreement, would be governed by Delaware law. It also contained an exclusive New York forum selection clause.

Following the execution of the Term Sheet, Strauss required Esio to renegotiate its ICC License Agreement to allow Strauss access to the ICC technology. Esio alleges that it had "no choice but to agree" to renegotiate **[*10]** the ICC license because Strauss insisted that it have access to the ICC technology as a condition of its investment.[15] The amended license allowed Strauss a sub-license to ICC's technology and required Esio to make minimum quarterly payments to ICC which were greater than those required by the previous license (the "Amended ICC License.") Under the Amended ICC License, Strauss positioned itself to receive exclusive rights to ICC's technologies in North America should Esio default on the $5 million bridge loan. The Amended ICC License was further amended in May 2012 to give Esio an exclusive license for ICC's technology to be used in beverage dispensing systems (the "Second Amended ICC License"). The Second Amended ICC License is governed by Arizona law and provides for mandatory arbitration of disputes between the parties arising under the agreement to be conducted in Phoenix, Arizona.

After entering into the Second Amended ICC License with Esio, ICC signed a Side Letter Agreement with Strauss on May 10, 2012, whereby ICC consented to Strauss receiving both a lien and security interest in all of Esio's rights under the Second Amended ICC License. The Side Letter Agreement contains **[*11]** a forum selection clause designating New York as the exclusive forum for resolution of disputes arising under that agreement.

---

[14] *Id.*

[15] *Id.* ¶ 48.

## D. The Parties Memorialize Their Agreement—The Papered Promises

The loan closed on May 14, 2012. Prior to closing, Esio alleges that Strauss explained that even though the loan agreement would provide that conversion to equity was an option, "Strauss would automatically exercise the 'option' upon completion of its due diligence."[16] The loan agreement would also provide for what Esio characterizes as "an aggressive amortization schedule" which Strauss and Ronen knew Esio would not be able to meet without the additional promised $25 million capital infusion.[17] Through the end of May 2012, Strauss continued to represent that the conversion of the loan as well as the exercise of a warrant to acquire the addition $25 million in equity would occur as soon Strauss' due diligence was completed.

### 1. The Loan Agreement

The Secured Convertible Loan Agreement between Strauss and Esio (the "Loan Agreement") was executed May 14, 2012, and provided for Strauss to lend Esio $5.25 million (the "Loan").[18] DLA Piper LLP served as counsel to Esio. Under the Loan Agreement **[*12]** and the attached Secured Convertible Promissory Note, Esio was to repay the outstanding principal amount as well as all other amounts by December 31, 2013. Esio also had the right to prepay the Loan.

Regarding conversion, the Loan Agreement provided that:

> At any time following the Closing Date but before the Maturity Date, [Strauss] may, at its option, convert all, but not less than all, of its Note . . . into such number of duly authorized, validly issued, Class A Units equal to the amount . . . determined by dividing (a) the sum of the then outstanding principal and unpaid accrued interest on the Note and the Additional Convertible Amount by (b) the Conversion Price in effect at the time of such conversion.[19]

---

[16] *Id.* ¶ 55.

[17] *Id.* ¶ 53. 10

[18] The parties agreed to add $250,000 to the initial $5 million Loan amount to pay for legal fees incurred in connection with the closing of the Loan.

[19] *Id.* Ex. 1.

Section 9 of the Loan Agreement sets forth the parties' rights in events of default, which events include Esio's failure to repay the Loan according to schedule. Significantly, the Loan Agreement does not list Strauss's failure to convert the Loan to equity as an event of default, nor does it prescribe any consequence should Strauss elect not to **[*13]** convert the Loan.

The Loan Agreement provides that the Loan Agreement and the rights and obligations of Esio and Strauss under it "SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE."[20] The Loan Agreement further provides that Delaware State courts or the United States District Court for the District of Delaware shall have "EXCLUSIVE JURISDICTION OVER THE PARTIES (AND THE SUBJECT MATTER) WITH RESPECT TO ANY DISPUTE OR CONTROVERSY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS."[21]

### 2. The Warrant

Strauss and Esio also entered into a Warrant on May 14, 2012, whereby Strauss was "entitled at any time . . . to purchase from [Esio] up to 37,395.33 Class A Units."[22] Strauss was entitled in its discretion to execute the Warrant "in whole or in part."[23] The Warrant contains a merger clause,[24] as well as an expiration date and remedies for breach. It states that the Warrant is to be construed under Delaware laws but does

---

[20] Id.

[21] Id. "Transaction documents" as defined within the Loan Agreement, include the Loan Agreement, the Note, the Warrant, Esio's Limited Liability Company Agreement, and the Security Agreements. Id.

[22] Id. Ex. 5.

[23] Id.

[24] Section 10.4 provides: "**Entire Agreement**. This Warrant, together with the applicable provisions of the Operating Agreement, constitute the entire agreement between the parties with respect to the specific subject matter hereof. Each provision hereof is severable for every other provision when determining legal enforceability. The terms and conditions hereof will inure to the benefit of and be binding upon the parties' respective successors and assigns, except as expressly provided otherwise herein." Id.

not **[*14]** contain a forum selection clause.[25]

### E. The Parties' Relationship Breaks Down

By the end of May 2012, Strauss began telling Esio that it would need to conduct additional due diligence before it could convert the Loan. This came as a surprise to Esio as it believed Strauss had already conducted exhaustive due diligence prior to entering the Loan Agreement. The following month, during a meeting with key players of Esio and Walmart® involved in Esio's scheduled product launch at Walmart®, Strauss representatives **[*15]** were "disruptive and disrespectful" towards the Esio representatives and "denigrated the [Esio] business plan that Strauss had already explicitly approved."[26] Strauss advised Esio that it might not make the $25 million equity investment even though Strauss knew Esio was counting on the investment and Esio was following the business plan that Strauss had directed and approved.

At some point after the Loan closed, Esio learned that Strauss' carbonation technology did not work. This rendered Strauss' promise of a strategic partnership illusory since Strauss' carbonation technology had been factored into Esio's business plan. To make matters worse, the launch of Esio products at Walmart® failed because Esio did not have the promised funds from Strauss to market the launch properly.

Esio also learned that Strauss had been meeting with Esio's customers without Esio's knowledge or permission. At a meeting with one such customer, PepsiCo, Strauss allegedly gave a demonstration of an Esio preproduction prototype of a carbonated beverage dispenser. The prototype malfunctioned. According to Esio, this episode "subverted Esio's chances of working with PepsiCo due to Strauss' use of a faulty **[*16]** product."[27]

In early 2013 Ronen began to make disparaging statements about Esio and its product to other Esio customers and licensors of Esio's technology, including

---

[25] Id. Section 10.7 of the Loan Agreement, however, provides that the forum selection clause designating Delaware courts applies to all "transaction documents," which includes the Warrant. Id. Ex. 1.

[26] Id. ¶ 67.

[27] Id. ¶ 74.

ICC. He also announced to third parties and eventually to Esio that Strauss never intended to invest in Esio and had only provided the Loan in order to get Esio's technology. In February 2013, Ronen said that it would seize the Esio intellectual property used to secure the Loan unless Esio was able to repay the Loan according to the agreed-upon schedule.

On February 13, 2013, Esio and Strauss met with Euro-Pro Operating, LLC, an appliance company interested in licensing manufacturing rights to Esio's beverage dispenser products. At the meeting, Esio hoped to discuss measures to reduce manufacturing costs, which would reduce Esio's need for a large capital infusion and help it stay viable. Ronen seized control of the meeting and advised Euro-Pro that Strauss controlled Esio's technology and the ICC License. Euro-Pro thereafter refused to deal with Esio.

During this same period, Ronen met with the Chief Executive Officer of ICC and the two discussed a potential business deal between Strauss and ICC that would exclude **[*17]** Esio and "secure Esio's demise."[28] Strauss sent Esio a formal notice of default under the Loan on February 17, 2013, and Esio's bankruptcy followed.

## II. PROCEDURAL STANDARD

_HN1_[⬆] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[29] Under this standard, Delaware courts will

> accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[30]

The Court will not, however, "accept conclusory allegations unsupported by specific facts . . . or draw unreasonable inferences in favor of the non-moving party."[31]

## III. ANALYSIS

To address Strauss' motion to dismiss I have divided Esio's claims into three parts. First, I examine whether Esio has stated viable claims for fraud, fraudulent inducement, negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, "breach of oral promise,"[32] promissory estoppel and estoppel. **[*18]** It is appropriate to group these claims together since the motion to dismiss challenges whether any of them are well-pled given that they rest on facts and alleged promises that contradict the clear terms of the parties' written contracts. Second, I examine the viability of Esio's claims for tortious interference with contract and tortious interference with prospective business relations. Finally, I consider Esio's claim that Strauss should be compelled to arbitrate these claims in Arizona.

## A. Esio's Claims That it Justifiably Relied Upon Extra-Contractual Promises and Representations and that Strauss Breached the Implied Covenant of Good Faith and Fair Dealing Are Belied by the Clear Terms of the Loan Agreement and Warrant

The disposition of Esio's fraud, estoppel, oral contract and implied covenant claims turns on a single factual fulcrum: the contracts between Esio and Strauss clearly set forth the parties' rights and obligations and patently contradict the claims Esio has attempted to plead in its Complaint. **[*19]** Under these circumstances, there can be no reasonable reliance and there can be no actionable extra-contractual covenants.

_HN2_[⬆] Delaware is a contractarian state.[33] As such, a

---

[28] _Id._ ¶ 82.

[29] _Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC, 27 A.3d 531, 536 (Del. 2011)._

[30] _Id._

[31] _Price v. E.I. DuPont de Nemours & Co., Inc., 26 A.3d 162, 166 (Del. 2011)._

[32] I am unaware of any cause of action cognizable under Delaware law for "breach of oral promise." I will assume Esio intends to prosecute a claim for breach of an oral contract.

[33] _GRT, Inc. v. Marathon GTF Tech., Ltd., 2011 Del. Ch. LEXIS 99, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011)_ (noting that Delaware law "is more contractarian than that of many other states"). _See also Nemec v. Shrader, 991 A.2d 1120, 1125 (Del. 2010)_ ("[W]e must . . . not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. _Parties_

party who enters into a contract governed by Delaware law will be charged with knowledge of the contents of the instrument and will be deemed to have knowingly agreed to the plain terms of the instrument absent some well-pled reason to infer otherwise. And this same party will face an uphill climb when it seeks to prosecute claims that it relied on promises that are explicitly contradicted by its own clear and unambiguous written contract. These bedrocks of Delaware law apply in full force here.

## 1. Esio Has Failed to State Claims for Fraud, Misrepresentation, Estoppel or Breach of Oral Contract

The gravamen of Esio's Complaint is that Strauss made promises in advance of entering into the Loan Agreement and Warrant that it would convert the $5 million Loan into an equity investment and that it would invest an additional $25 million in Esio in short order after the Loan closed. Esio alleges that it relied on these promises when it agreed, *inter alia*, to commit its intellectual property to Strauss as security for the Loan and to amend its license with ICC. Now that it is clear Strauss never intended to invest in Esio, it is alleged that the pre-contract promises are either fraudulent or negligent misrepresentations and that Strauss should be estopped from denying **[*21]** its pre-contract commitments.

*HN3*[↑] Claims for fraud, fraudulent inducement, negligent misrepresentation, promissory estoppel and estoppel all require a plaintiff to plead that he justifiably or reasonably relied on the defendant's promise.[34] Esio

---

*have a right to enter into good and bad contracts, the law enforces both.*") (emphasis added); *Libeau v. Fox, 880 A.2d 1049, 1056-57 (Del. Ch. 2005), aff'd in pertinent part, 892 A.2d 1068 (Del. 2006)* ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon **[*20]** a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."); *Asten, Inc. v. Wangner Sys. Corp., 1999 Del. Ch. LEXIS 195, 1999 WL 803965, at *6 (Del. Ch. Sept. 23, 1999)* ("Equity respects the freedom to contract. . . .").

[34] *HN5*[↑] "In order to state a claim for fraud or fraudulent inducement, plaintiff must plead with particularity the following

---

has failed to plead facts upon which I can reasonably infer that it justifiably relied on Strauss' promises made prior to the execution of the parties' written contracts since the alleged promises are expressly contradicted by those same contracts. Indeed, *HN4*[↑] "[i]t is unreasonable to rely on oral representations when they are expressly contradicted by the parties' written

---

elements: (1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the **[*22]** plaintiff to act or refrain from acting; (4) **the plaintiff's action or inaction taken in justifiable reliance upon the representation**; and (5) damage to the plaintiff as a result of such reliance." *Duffield Assocs., Inc. v. Meridian Architects & Eng'rs, LLC, 2010 Del. Super. LEXIS 293, 2010 WL 2802409, at *4 (Del. Super. July 12, 2010)* (emphasis added). *HN6*[↑] To state a claim for negligent representation, a plaintiff must "plead that (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) **the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information**." *Corporate Prop. Assocs. 14 Inc. v. CHR Holdings, 2008 Del. Ch. LEXIS 45, 2008 WL 963048, at *8 (Del. Ch. Apr. 10, 2008)* (emphasis added). "Negligent representation is essentially a species of common law fraud with a lesser state of mind requirement." *Vichi v. Koninklijke Philips Elecs, N.V., 85 A.3d 725, 762 (Del. Ch. 2014)*. *HN7*[↑] To state a claim for promissory estoppel, "a plaintiff must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) **the promisee reasonably relied on the promise and took action to his detriment**; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Black Horse Capital, LP v. Xstelos Hldgs., Inc., 2014 Del. Ch. LEXIS 188, 2014 WL 5025926, at *21 (Del. Ch. Sept. 30, 2014)* (emphasis **[*23]** omitted).*HN8*[↑] "To prevail on a claim of equitable estoppel, a plaintiff must show (1) conduct by the party to be stopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and **good faith reliance by the other**, and (4) action or forbearance by the other party amounting to a change of status to his detriment." *Olson v. Halvorsen, 2009 Del. Ch. LEXIS 78, 2009 WL 1317148, at *11 (Del. Ch. May 13, 2009), aff'd, 986 A.2d 1150 (Del. 2009)* (emphasis added) (internal quotation marks omitted).

agreement."[35] Given that the parties' written agreements are so clear, it is not surpising that Esio has not cited any authority that would support its argument that reliance upon contrary oral promises would be reasonable.[36]

As stated, the extra-contractual promises and representations that Strauss is alleged to have made are variations on a theme: that Strauss would invest in and cooperate with Esio as Esio's long-term business partner. Esio alleges that Strauss promised that it would share its technology with Esio, that it would work with Esio to implement Esio's long-term business plan and that it would provide Esio with $30 million in equity financing. These alleged promises are expressly contradicted by the several transactional documents that Strauss and Esio entered into—negotiated at arm's-length by sophisticated parties with the guidance of sophisticated counsel. Each of these contracts—the Term Sheet, Loan Agreement and Warrant—structures Strauss' "investment" as either debt with the option to be converted to equity or as an option to acquire equity.[37]

---

[35] *Carrow v. Arnold, 2006 Del. Ch. LEXIS 191, 2006 WL 3289582, at *11 (Del. Ch. Oct. 31, 2006),* aff'd, 933 A.2d 1249 (Del. 2007). While in *Carrow* the Court addressed a claim for fraudulent inducement, this principle also applies to the balance of Esio's misrepresentation and estoppel claims. *See MicroStrategy Inc. v. Acacia Research Corp., 2010 Del. Ch. LEXIS 254, 2010 WL 5550455, at *14 (Del. Ch. Dec. 30, 2010)* (rejecting a fraud claim based on three oral statements that were expressly contradicted by a later contract); *Olson, 2009 Del. Ch. LEXIS 78, 2009 WL 1317148, at *12* ("Olson's [promissory and equitable] estoppel claims fail for the additional reasons that the alleged promises on which [*24] he bases his claims are inconsistent with the terms of the [contracts].")

[36] *See Carrow, 2006 Del. Ch. LEXIS 191, 2006 WL 3289582, at *11* (holding that one cannot claim fraudulent inducement "when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation" (quoting *17A Am.Jur.2d Contracts § 214* (2006)).

[37] "[T]he parties shall enter into the Convertible Loan Agreement, pursuant to which Strauss Water shall provide a loan of $5 million to Esio." Compl. Ex. 2 (the "Term Sheet"). "During the period until the Loan is either converted or repaid [describing rights Strauss will be given]." *Id.* "Strauss Water will have the option, to be exercised not later than December 31, 2013, to convert the Loan into shares of Esio." *Id.* "The Lender agrees . . . to make a loan (the **"Loan"**) to the Borrower in an amount of up to five million two-hundred fifty thousand dollars." *Id.* Ex. 1 (the "Loan Agreement"). "The

---

Specifically, the documents clearly and unambiguously characterize Strauss' commitment [*25] as a loan with an **"option"** that Strauss **"may"** exercise to convert the Loan to an equity investment (the Loan Agreement) and as an **"option"** that Strauss **"may"** exercise to acquire additional equity units (the Warrant).[38] The contracts do not even hint much less expressly reveal that the parties understood, as a matter of contract or otherwise, that Strauss was somehow obliged to invest in Esio.[39]

Esio's attempt to alter the construction of the Loan Agreement's and Warrant's otherwise unambiguous provisions regarding the terms of Strauss' Loan to Esio and its possible investment in Esio, respectively, cannot be countenanced for another reason that also is embedded in Delaware law. *HN9*[↑] Delaware's "parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of the contract."[40] Thus, even if a provision is "mistakenly" left

---

Borrower's obligation to pay the principal of, and interest on, the Loan shall be evidenced by a secured convertible promissory note . . . (the **"Note"**). *Id.* "[T]he Lender may, at its option, convert all, but not less than [*26] all, of its Note." *Id.* "Strauss Water shall have the option, to be exercised not later than March 31, 2013, to make an additional equity investment in Esio of an additional $25 million based on a pre-money valuation of $45 million, subject to Esio meeting certain performance targets as described below." *Id.* Term Sheet. "This Warrant certifies that, for value received, Strauss Water Ltd. . . . is entitled at any time . . . to purchase from Company up to 37,395.33 Class A Units (**"Warrant Units"**) at a price per Class A Unit equal to $668.53." *Id.* Ex. 5 (the "Warrant"). "Holder may exercise this Warrant, in whole or in part . . . at any time before the Expiration Date." *Id.*

[38] Esio has suggested in its papers and at oral argument that the term "option" may be ambiguous. Pl.'s Answering Br. in Opp'n to Def.'s Mot. to Dismiss Pl.'s Verified Am. Compl. ("Answering Br.") 16-18. To the extent Esio still intends to press that argument, I summarily reject it. I will not embrace a construction of the term "option" that suggests it might reasonably be read as "mandatory option." I am aware of no such creature in the realm of corporate finance or the broader realm of life. The terms "mandatory" and [*27] "option" present the classic binary opposition.

[39] *See MicroStrategy Inc., 2010 Del. Ch. LEXIS 254, 2010 WL 5550455, at *14* (granting motion to dismiss claim of reasonable reliance that was "contradicted by several express terms in the Agreement"); *Black Horse Capital, LP, 2014 Del. Ch. LEXIS 188, 2014 WL 5025926, at *21-22* (same).

[40] *Phillips v. Wilks, Lukoff & Bracegirdle, LLC, 2014 Del. LEXIS 449, 2014 WL 4930693, at * 3 (Del. Oct. 1, 2014),* as

out of a document, "the parole evidence rule precludes the Court from considering the alleged oral promises made before the execution of [a written contract]."[41] The Court, instead, must be guided by what the parties say in their written contracts; it cannot be distracted by misguided allegations of fraud or estoppel, however passionately they might be pled.[42]

Esio also misses the mark by arguing that the express terms of the contracts it negotiated and agreed to with Strauss cannot defeat its claim of justifiable reliance on prior oral promises because the Loan Agreement contains no integration clause and the integration clause within the Warrant is ineffective because it lacks an anti-reliance clause.[43] Strauss' arguments that Esio has failed to plead facts that would justify departing from the express terms of the parties' written agreements do not rest on the presence, or not, of integration or anti-reliance clauses. Instead, Strauss correctly argues that Esio cannot proffer alleged oral promises or representations to alter or contradict unambiguous provisions clearly expressed within the parties' written contracts. Yet that is precisely what Esio seeks to do here with respect to its fraud, negligent [*29] misrepresentation,[44] estoppel and oral contract claims.

_____

*corrected* (Oct. 7, 2014) (citations omitted).

[41] *TrueBlue, Inc. v. Leeds Equity Partners IV, LP, 2015 Del. Super. LEXIS 524, 2015 WL 5968726, at \*4 (Del. Super. Ct. Sept. 25, 2015)* (further stating that while the agreement at issue "may not set forth everything [*28] in hindsight that TrueBlue intended to include, . . . that does not create an ambiguity").

[42] *Black Horse Capital, LP, 2014 Del. Ch. LEXIS 188, 2014 WL 5025926, at \*24* ("By attempting to plead around the plain language of their written agreements with allegations of 'fraud,' Plaintiffs seek to shirk the bargain evidenced by the written agreement in favor of a 'but we did rely on those other representations' claim).

[43] Answering Br. 22-24.

[44] The negligent misrepresentation claim also fails because it is barred by *HN10*[⬆] the economic loss doctrine, which allows a party to recover in negligence only "if losses are accompanied by bodily harm or property damages." *J.C. Trading Ltd. v. Wal-Mart Stores, Inc., 947 F.Supp. 2d 449, 459 (D. Del. 2013)* (internal quotation marks omitted). It does not permit recovery "for losses that are solely economic in nature." *Id.* (internal quotation marks omitted). Here, Esio is claiming only economic damages and does not allege damage to its intellectual property or to Esio's rights as a licensee to ICC's intellectual property. While Esio alleges that it lost its technology and licensing rights, Compl. ¶ 121, it does not

Even where certain of the alleged oral promises are not expressly contradicted by the written contracts, such as Esio's contention that Strauss promised it would share its working carbonation technology when, in fact, it did not work, Esio still has failed to plead facts that allow a reasonable inference of justifiable [*30] reliance as a matter of law. The Term Sheet provided that Strauss and Esio would enter into an agreement regarding Esio's use of Strauss' carbonation technology, and the subsequent License and Distribution Agreement between Esio and Strauss expressly addresses the parties' rights to cross license.[45] Yet Esio pleads neither that Strauss breached that agreement nor that Strauss somehow prevented Esio from exercising its bargained-for right under that agreement to conduct due diligence with respect to Strauss' carbonation technology.[46] Once again, Esio seeks to avoid the deal it made in favor of the deal it now wishes it made. Delaware law does not permit Esio or the Court to rewrite history when that history is expressed in clear and unambiguous written contracts.

Esio's fraud, misrepresentation and estoppel claims require well-pled facts to support a reasonably conceivable inference that Esio justifiably relied upon Strauss' extra-contractual promises or representations. Esio's written contracts with Strauss allow no such inference. Nor can the Court enforce alleged oral promises that directly contradict commitments made in subsequent written contracts. Strauss' motion to dismiss these claims must be granted.

## 2. Esio Has Failed to State a Claim for Breach of the Implied Covenant

_____

allege that there was any damage to the technology or its rights as a licensee, except that it was unable to pay the Loan and therefore defaulted under the Second Amended ICC License.

[45] Transmittal Aff. of Phillip A. Rovner, Esq. in Supp. of Strauss Water, Ltd.'s Mot. to Dismiss ("Transmittal Aff.") Ex. 8. The Court may consider this agreement as it is integral to the Plaintiff's Complaint. *See* Compl. ¶¶ 73, 85(viii). *See also Allen v. Encore Energy P'rs, L.P., 72 A.3d 93, 96 n.2 (Del. 2013)*.

[46] Transmittal Aff. Ex. 8 § 6.4.1(a). *See Interim Healthcare, Inc. v. Spherion Corp., 884 A.2d 513, 551 n.305 (Del. Super. Ct.)* ("Delaware courts will not rescue disappointed buyers from circumstances that could have been guarded against through normal due diligence and [the exercise of] [*31] contractual protections"), *aff'd, 886 A.2d 1278 (Del. 2005)* (TABLE).

Esio alleges that even though Strauss may have complied with written contracts that directly address the terms of Strauss' Loan and possible equity investment, Esio may still hold Strauss liable for breaching the implied covenant of good faith and fair dealing. I disagree. *HN11*[↑] The implied duty of good faith and fair dealing applies only when "it is clear from the underlying contract that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."[47] It follows, then, that the implied covenant of good faith and fair dealing does not apply when the **[*32]** contract speaks directly to the alleged gap in the contract the implied covenant has been proffered to fill.[48] Esio's claim for breach of the implied covenant of good faith and fair dealing fails since the contracts speak directly to the contested issue—that the Loan may but need not be converted to equity and that any future investments are optional, not mandatory.

## B. Tortious Interference

As is typical of Esio's complaint, many of its allegations regarding tortious interference attempt to reach outside the four corners of its contracts with Strauss and impose upon Strauss additional obligations or alternatively limit Strauss' bargained-for rights. As discussed below, Esio's claim for tortious interference with contract is not well-pled because Esio again seeks to vary the terms of its written contracts with Strauss in order to state an extra-contractual claim. However, **[*33]** a single subset of its claim for tortious interference with prospective business relations (that does not attempt to alter the parties' contracts) does survive as Esio has well-pled that Strauss interfered with Esio's prospective business relationship with Euro-Pro.

### 1. Esio has Failed to State a Claim for Tortious Interference with Contract

Esio alleges that Strauss tortiously interfered with the

---

[47] *Winshall v. Viacom Intern., Inc., 55 A.3d 629, 637 (Del. Ch. 2011)* (internal quotation marks omitted).

[48] *Airborne Health, Inc. v. Squid Soap, LP, 984 A.2d 126, 146 (Del. Ch. 2009)* ("The implied covenant does not apply when the subject at issue is expressly covered by the contract" and "[c]ourts should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it." (internal quotation marks omitted)).

Second Amended ICC License by (a) forcing Esio to renegotiate the ICC License and then putting Esio in a financial position where it was unable to make its payments to ICC and (b) colluding with ICC in a manner that caused ICC to breach the implied covenant of good faith and fair dealing by refusing to modify the ICC license.[49] Because Strauss acted within its contractual rights, Esio's allegations of tortious interference fail to state a claim.

*HN12*[↑] The typical claim for tortious interference arises when the defendant wrongfully prevents a third party from performing a contract. This cause of action follows the *Restatement (Second) of Torts, § 766*, and requires "(1) a valid contract, (2) about which the defendants have knowledge, (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract, (4) without justification and (5) which causes injury."[50]

*Section 766A of the Restatement (Second) of Torts* extends the cause of action to instances where the defendant is alleged to have tortiously interfered with the *plaintiff*'s performance of a contract, providing that *HN13*[↑] "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him."[51] The cause of action outlined in *Section 766A* is less widely adopted,[52] and has never formally been recognized by Delaware courts.[53]

---

[49] Esio's only claim for tortious interference with contract relates to the Second Amended ICC License. While Esio also alleges that Strauss tortiously interfered with its relationship with Walmart®, it classifies this claim as tortious interference with prospective business relations and does not allege that Strauss caused Walmart® to breach an existing contract. **[*34]** Compl. ¶¶ 160, 165-66, 150-57.

[50] *Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987)* (citing *Restatement (Second) of Torts § 766* (1979)).

[51] *Restatement (Second) of Torts § 766A* (1979).

[52] *See, e.g., Price v. Sorrell, 784 P.2d 614 (Wyo. 1989)* (rejecting *Section 766A* as a viable cause of action due largely to the potential for abuse and citing **[*35]** cases in accord).

[53] Esio cites *Allen Family Foods, Inc. v. Capitol Carbonic*

As discussed below, whether the claim is brought under *Section 766* or *Section 766A*,**HN14**[↑] a plaintiff cannot prevail on a tortious interference with contract claim if the essence of his complaint is that the defendant refused to deal when he had no obligation to deal,[54] or that the defendant's alleged tortious conduct amounted to nothing more than the defendant acting within its contractual rights.[55] Both of Esio's theories of tortious interference with contract, as pled, rest on these unactionable premises.

### a. Esio Has Not Stated a Claim Under *Section 766A*.

I have already determined that the contracts between Esio and Strauss merely provided Strauss with the option to convert the Loan to equity and to make further equity investments. Therefore, Strauss's decisions to enforce its Loan covenants with Esio when Esio defaulted on the Loan, including its seizure of the pledged collateral, and not to invest further in Esio cannot constitute tortious interference with Esio's performance of the Second Amended ICC License or any other contract since Strauss' refusal to deal was justified. Since Esio has failed to plead that Strauss' conduct was tortious, I need not decide whether *vel non Section 766A* should be adopted as Delaware law.

---

*Corp., 2011 Del. Super. LEXIS 129, 2011 WL 1205138 (Del. Super. Ct. 2011)*, for the proposition that Delaware has formally adopted *Section 766A* as a cause of action. This reads too much into the *Allen* court's treatment of *Section 766A*. *Allen* merely determined that "Delaware would not reject *Section 766A*" on the bases proffered by the defendant there before going on to hold that the plaintiff had not stated a viable claim under *Section 766A* in any event. *2011 Del. Super. LEXIS 129, [WL] at *6*. The same holds true here; Esio has failed to plead a claim under *Section 766A*.

[54] *Restatement (Second) of Torts § 766 cmt. b* (1979).

[55] *See, e.g., DeBakey Corp. v. Raytheon Service Co., 2000 Del. Ch. LEXIS 129, 2000 WL 1273317, at *18 (Del. Ch. Aug. 25, 2000)* (refusing to find a party liable for breaching its implied covenant of good faith and fair dealing when it failed to make a further investment where the contract provided that once investments had exceeded $2 million, further investments **[*36]** were subject to the party's "sole discretion"). *See also Crivelli v. General Motors Corp., 215 F.3d 386, 395 (3d Cir. 2000)* (applying Pennsylvania law and noting that many courts have "held that a company's exercise of a right of first refusal [granted to them in contract] cannot ordinarily give rise to a claim of intentional interference with a contract").

### b. Esio Cannot Claim that Strauss Tortiously Caused ICC to Breach the Implied Covenant of Good Faith and Fair Dealing

**HN15**[↑] A party cannot claim a tortious interference with contract when there has been no breach **[*37]** of that contract.[56] To get around this fundamental premise, Esio seeks once again to invoke the implied covenant of good faith and fair dealing to achieve what its express contracts (in this instance, the Second Amended ICC License) will not support—a basis to impose liability upon Strauss for ICC's refusal to modify the Second Amended ICC License so that Esio could continue to exploit it. The implied covenant will not impose on ICC an obligation that Esio did not bargain for in the Second Amended ICC License.

**HN16**[↑] While it is true that the implied covenant of good faith and fair dealing inheres to every Delaware contract, it cannot be employed to rewrite an otherwise comprehensive written contract between the parties.[57] Rather, the implied covenant requires parties to a contract only to "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[58] The court will not impose the implied duty of good faith and fair dealing on a party to require that the party actually improve the deal the plaintiff struck in the first instance.[59]

Once again, Esio would have the Court ignore the contract it negotiated with ICC by injecting it with provisions that would require ICC to modify the license in the event Esio committed an act of default under either the Second Amended ICC License or the Loan Agreement. This Court will not engage in that kind of

---

[56] *Aspen Advisors LLC v. United Artists Theatre Co., 843 A.2d 697, 713 (Del. Ch.)*, aff'd, *861 A.2d 1251 (Del. 2004)*.

[57] *Nemec v. Shrader, 991 A.2d 1120, 1125-26 (Del. 2010)*.

[58] *Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005)* (internal quotation marks omitted).

[59] *Winshall, 55 A.3d at 641* (holding that Delaware law **[*38]** does not interpret the implied covenant to a require that the defendant "not simply refrain from upsetting the fundamental expectations of the other party, as implied by the explicit terms of the deal, but actually improve that deal by expanding its contractual counterparty's expectancy as a matter of judicially compelled charity.").

"judicially compelled charity."[60] Esio could have negotiated for a provision that expanded its rights to compel a modification of the Second Amended ICC License in certain instances of default. It did not. Therefore, because ICC was not required to modify the Second Amended ICC License, Strauss cannot be held liable for tortiously interfering with the Second Amended ICC License by causing ICC to breach the implied covenant when it refused to modify that contract.

## 2. Esio Has Stated a Claim for Tortious Interference with Prospective Business Relations [*39]

**HN17**[⬆] To plead a claim for tortious interference with prospective business relations, Esio was required to allege facts that demonstrate "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation and (d) damages."[61] In addition, Esio was required to plead that Strauss' alleged interference was somehow improper.[62] As discussed above, there can be no improper interference where the defendant acted either (1) affirmatively within its contractual rights or (2) by omission where it had no contractual obligation to deal. Thus, having determined that Strauss was within its contractual rights to enforce its Loan covenants and decline to invest in Esio, any claim that Strauss tortiously interfered with Esio's prospective business relations with Walmart® or any other retailer or supplier by failing to infuse Esio with more capital is not well-pled.[63]

What remains of Esio's tortious [*40] interference with prospective business relations claim are Esio's allegations that Strauss: (1) intentionally sabotaged the Euro-Pro meeting and thereby interfered with Esio's prospects of developing a business relationship with Euro-Pro, and (2) improperly met with PepsiCo without Esio's knowledge or permission and thwarted any

---

[60] Id.

[61] De Bonaventura v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1153 (Del. 1981). See also Restatement (Second) of Torts § 766B (1979).

[62] See Lipson v. Anesthesia Servs., P.A., 790 A.2d 1261, 1287 (Del. Super. Ct. 2001) ("Plaintiffs bear the burden of proof with respect to all elements of the claim of intentional interference, including that the interference was improper").

[63] Compl. ¶¶ 160, 163, 165-66.

possible business relationship with PepsiCo by claiming the Esio's products belonged to Strauss and demonstrating a faulty product prototype.[64]

**HN18**[⬆] While the plaintiff must ultimately prove the reasonable probability of a business opportunity, the "existence of such a business expectancy is a question of fact not suitable for resolution [on a motion to dismiss]."[65] Esio has pled prospective business opportunities with Euro-Pro and PepsiCo and those well-pled facts are presumed to be true at this stage of the proceedings.

Esio has also pled that Strauss engaged in conduct with respect to PepsiCo and Euro-Pro that interfered with Esio's prospects of developing business relationships with these two fixtures of the beverage industry. Strauss counters that any conduct in which it might have engaged at meetings with PepsiCo and Euro-Pro was justified [*41] under Sections 769[66] and 773[67] of the Restatement (Second) of Torts because it was protecting its legally protected or financial interests.[68]

---

[64] Compl. ¶¶ 74, 161, 163(vi).

[65] Gill v. Del. Park, LLC, 294 F.Supp. 2d 638, 646 (D. Del. 2003).

[66] "One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he (a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation." Restatement (Second) of Torts § 769 (1979).

[67] "One who, by asserting in good faith a legally protected interest of his own or threatening [*42] in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." Restatement (Second) of Torts § 773 (1979).

[68] The "burden of showing privilege rests upon the [alleged] interferor. . . ." Bowl-Mor Co. v. Brunswick Corp., 297 A.2d 61, 66 (Del. 1972) (addressing a defense raised under Section 769). See also Matter of L.B. Trucking, Inc., 163 B.R. 709, 725 (Bankr. D. Del. 1994) (in discussing Section 773 the court stated that "[i]f these circumstances exist, the defendant has a meritorious defense to the alleged tort of intentional interference with the performance of a contract by a third person.").

Strauss points to no particular provision in any of its contracts with Esio that would authorize Strauss to represent to potential business partners that Esio's products and technology actually belonged to Strauss or would permit Strauss to make disparaging comments about the efficacy or quality of Esio's technology or product line.[69] Instead, Strauss argues generally that it took steps it believed were necessary under the circumstances to protect its Loan collateral.[70] While this may ultimately prove true, justification defenses under Sections 769 and 773 present fact-intensive inquiries that are typically not appropriate for disposition on a motion to dismiss.[71]

Esio also must plead that Strauss' alleged tortious interference was the proximate cause of its damages. **HN19**[↑] Delaware embraces a "but for" causation paradigm where proximate cause exists when an act or omission "in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred."[72]

Esio alleges that Strauss' statements to PepsiCo representatives that Strauss, not Esio, controlled Esio's [*44] products and technology, and its demonstration to PepsiCo of a faulty prototype, tortiously interfered with any prospect that Esio might form a business relationship with PepsiCo.[73] What Esio has failed to plead, however, is that a business relationship with PepsiCo might have saved Esio from the harm it alleges to have suffered as a proximate result of the wrong. The Complaint contains no allegations of what a business relationship with PepsiCo might have brought to Esio or how it might have saved Esio from its financial demise. In the absence of such allegations, it is not reasonably conceivable that Strauss' alleged tortious interference with Esio's prospective business relationship with PepsiCo was a proximate cause of Esio's alleged harm.[74]

Esio's allegations with respect to the lost business opportunity with Euro-Pro are more substantive. As noted, Esio alleges that Strauss hijacked its meeting with Euro-Pro and told Euro-Pro that it would have to [*45] deal with Strauss because Strauss now controlled Esio's technology.[75] The purpose of this meeting, at least from Esio's perspective, was to enlist Euro-Pro as a partner who might offer "measures that would help Esio reduce manufacturing costs to remain financially viable and reduce the need for a larger financial investment."[76] The allegations are thin but do present a reasonably conceivable basis upon which Esio might demonstrate that a business relationship with Euro-Pro, had Strauss not interfered with it, would have lowered Esio's manufacturing costs in a manner that would have allowed it to service its debt with Strauss and remain viable. Therefore, Esio has adequately pled that Strauss' actions during the Euro-Pro meeting were a proximate cause of its damages.

## C. Esio Has Pled No Basis to Compel Arbitration

Esio seeks a declaration that Strauss must arbitrate the claims Esio has brought in this Court because they are connected to claims that are the subject of arbitration proceedings pending between Esio and ICC in Arizona. Once again, Esio would have the Court vary the terms

---

[69] These allegations must be accepted as true at this stage of the proceedings.

[70] Def. Strauss Water Ltd.'s Opening Br. in Supp. of its Mot. to Dismiss the Am. Compl. 44-48.

[71] For instance, according to the Complaint, the meetings with PepsiCo and Euro-Pro where Strauss is alleged to have engaged in tortious interference occurred prior to Strauss declaring a default of the Loan. Compl. ¶¶ 74-81 (Strauss meets with customers after the Loan closed through [*43] early February, 2013); Id. ¶ 83 (Strauss sends notice of default on February 17, 2013). The extent to which Strauss was justified in taking actions with respect to PepsiCo and Euro-Pro to protect its collateral prior to declaring a default of the Loan is, at least in part, a question of fact. Section 769 requires Strauss to demonstrate it did "not employ wrongful means;" Section 773 requires Strauss to demonstrate that it acted in "good faith" using "appropriate means." Restatement (Second) of Torts §§ 669, 773 (1979). These are fact-intensive inquiries that must be undertaken with the benefit of a factual record. See Bowl-Mor Co., 297 A.2d at 66 (holding that justification defense could not be determined "as a matter of law").

[72] Duphily v. Del. Elec. Co-op., Inc., 662 A.2d 821, 828-29 (Del. 1995) (internal quotation marks and alterations omitted).

[73] Compl. ¶¶ 74, 161, 163(vi).

[74] See Malpiede v. Townson, 780 A.2d 1075 (Del. 2001) (affirming dismissal of tortious interference claim on motion to dismiss because it was not reasonably conceivable based on the complaint that the alleged interference proximately caused the harm alleged).

[75] Compl. ¶¶ 80-81, 163(ii).

[76] Id. ¶ 79.

of its contracts with Strauss to compel a result for which it did not bargain. [*46]

Esio and Strauss disagree about whether Arizona or Delaware law governs the determination of whether the arbitration clause in the Second Amended ICC Agreement is binding upon Strauss. _HN20_[⬆] When determining which sovereign's laws to apply when laws potentially conflict, Delaware courts use a two-part test:

> [F]irst, the court determines whether there is an actual conflict of law between the proposed jurisdictions. If there is a conflict, the court determines which jurisdiction has the 'most significant relationship' to the occurrence and the parties' based on the factors (termed "contacts") listed in the Restatement (Second) of Conflict of Laws.[77]

Where the result would be the same under both sovereign's laws, there is a "false conflict" and "the Court should avoid the choice-of-law analysis altogether."[78] Here, both parties agree in their briefs that the there is no real conflict between Delaware and Arizona with regard to the arbitration issue.[79] I will apply Delaware law.

It_HN21_[⬆] is "well settled law in Delaware that choice of forum provisions are enforceable."[80] The Loan Agreement contains a Delaware forum selection provision that governs both that contract and the Warrant. Absent some compelling reason to disregard this provision, it should be enforced. The Side Letter that Strauss entered into with ICC, which incorporates the Second Amended ICC License, contains its own forum selection clause selecting New York State courts or federal courts that sit in the Borough of Manhattan. None of these agreements to which Strauss is a party require Strauss to submit to arbitration with Esio.

_HN22_[⬆] As a general rule, this Court will compel

---

77 _Bell Helicopter Textron, Inc. v. Arteaga, 113 A.3d 1045, 1050 (Del. 2015)._

78 _Deuley v. DynCorp Int'l, Inc., 8 A.3d 1156, 1161 (Del. 2010)._

79 _See_ Answering Br. 51, n.13 ("Even if Delaware law applied to this analysis, the result would be the same"); Def. Strauss Water Ltd.'s Reply Br. in Further Supp. of its Mot. to Dismiss the Compl. 32 ("The result is the same, however, [*47] even if Arizona law applies").

80 _Flintkote Co. v. Aviva PLC, 769 F.3d 215 (3d Cir. 2014)_ (applying Delaware law).

parties to submit to arbitration only where they have agreed to arbitrate as a matter of contract.[81] A non-signatory will be bound by an arbitration clause within a contract only if "traditional principles of contract and agency law equitably confer upon that party signatory status with regard to the underlying agreement."[82] A non-signatory may be found to have "embraced" a contract "(1) where the non-signatory direct[ly], rather than indirect[ly] benefit[ted] from the [agreement] during the course of the agreement's performance[,]; [*48] (2) where the non-signatory consistently maintain[s] that other provisions of the same contract should be enforced to benefit him[,]; or (3) where the non-signatory sue[s] to enforce the provisions of a contract that it likes, while simultaneously disclaiming the provisions that it does not."[83]

_HN23_[⬆] Under the third-party beneficiary theory, the third-party must directly benefit from the agreement. While Esio renegotiated with ICC to allow Strauss access to the ICC technology, Strauss' rights to this technology did not flow directly from the Second Amended ICC License. Rather, Strauss' benefit from the Second Amended ICC License was indirect and was dependent upon the Side Letter where ICC approved Strauss' security interest in Esio's license to ICC technology, the pledge of the Second Amended ICC License as collateral for the Loan and the cross-licensing agreement between Strauss and Esio. Since Strauss did not directly benefit from the Second Amended ICC License, the third-party beneficiary theory cannot be used to compel Strauss to join the Arizona arbitration.[84]

_HN24_[⬆] The doctrine of equitable estoppel may also bind a party to an arbitration agreement even where it is a non-signatory if the non-signatory "by his conduct

---

81 _James & Jackson, LLC v. Willie Gary, LLC, 906 A.2d 76, 78-79 (Del. 2006)._

82 _NAMA Hldgs., LLC v. Related World Mkt. Ctr., 922 A.2d 417, 430 (Del. Ch. 2007)._

83 _Flintkote, 769 F.3d at 221_ (alteration in original) (internal quotation marks omitted).

84 I note that the third-party beneficiary theory is typically cited as a basis to bind [*49] a non-signatory to arbitration when the non-signatory seeks to prosecute claims outside of arbitration. Esio has failed to cite any cases where this theory has been applied by a court to bind a non-signatory defendant to arbitrate claims brought against it.

intentionally or unintentionally leads another, in reliance upon that conduct, to change position to its detriment."[85] The party who claims that another is bound to an arbitration clause by estoppel must demonstrate that "(i) [it] lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) [it] reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) [it] suffered a prejudicial change of position as a result of their reliance."[86] The estoppel theory breaks down when the party seeking to compel arbitration is a party to another agreement with the party whom it seeks to compel to arbitrate, that other agreement is central to the dispute and it contains an express forum selection provision.[87] Under these circumstances, **[*50]** the moving party will be precluded from claiming that it reasonably expected it would be able to compel arbitration notwithstanding the contrary forum selection provision to which it agreed.[88]

Here, Strauss expressly maintained its right to litigate claims arising under the Loan Agreement, Warrant and Side Letter in the fora agreed to by the parties to those contracts. Therefore, Esio cannot be heard to argue that Strauss is estopped from refusing to submit to arbitration under the Second Amended ICC License or that it should be compelled to do so.

## IV. CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim upon which relief can be granted under *Court of Chancery Rule 12(b)(6)*. Defendants' motion to dismiss is GRANTED as to Counts I, II, III, IV, V, VI, VII, VIII and X with prejudice, and DENIED as to Count IX (only with respect to the alleged tortious interference with Esio's prospective business relations with Euro-Pro).

**IT IS SO ORDERED**.

---

[85] *Wilson v. Am. Ins. Co., 58 Del. 394, 209 A.2d 902, 903-04, 8 Storey 394 (Del. 1965)*.

[86] *Nevins v. Bryan, 885 A.2d 233, 249 (Del. Ch.)*, aff'd, **884 A.2d 512 (Del. 2005)**.

[87] *Flintkote, 769 F.3d at 223*.

[88] *See id.* (finding that the defendant was not required to arbitrate where it was party to an agreement with the plaintiff that contained an express forum selection provision).

End of Document

# EXHIBIT 4



# *Volodarskiy v. Delta Air Lines, Inc.*

United States District Court for the Northern District of Illinois, Eastern Division

October 29, 2012, Decided; October 29, 2012, Filed

No. 11 C 00782

**Reporter**

2012 U.S. Dist. LEXIS 154831 *

GENNADIY VOLODARSKIY and OXANA VOLODARSKAYA on behalf of themselves, their minor children, all others similarly situated, Plaintiff, v. DELTA AIR LINES, INC., Defendant.

**Subsequent History:** Dismissed by *Volodarskiy v. Delta Air Lines, Inc., 2013 U.S. Dist. LEXIS 148657 (N.D. Ill., Oct. 16, 2013)*

## Core Terms

flight, regulation, passengers, Conditions, Carriage, Notice, website, boarding, Airline, delayed, cancellations, tickets, preempted, posted, fare, breach of contract claim, rules and regulations, incorporation, preemption, allegations, provisions, external, terms of the contract, hyperlink, e-ticket, terms, part of the contract

**Counsel:** **[*1]** For Gennadiy Volodarskiy, Oxana Volodarskaya, on behalf of their minor children, and on behalf of herself, and all others similarly situated, Plaintiffs: Daniel O. Herrera, Jennifer Winter Sprengel, Cafferty Clobes Meriwether & Sprengel LLP, Chicago, IL; Vladimir M. Gorokhovsky, Law Offices of Vladimir M. Gorokhovsky, Glendale, WI; Joseph Henry "Hank" Bates, III, Carney Williams Bates Pulliam & Bowman, PLLC, Little Rock, AR.

For Delta Airlines, Inc., Defendant: Mark Robert Filip, LEAD ATTORNEY, Gabor Balassa, Martin Louis Roth, Kirkland & Ellis LLP, Chicago, IL.

**Judges:** Honorable Edmond E. Chang, United States District Judge.

**Opinion by:** Edmond E. Chang

## Opinion

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Gennaldiy Volodarskiy, Oxana Volodarskaya, and their minor children (together, "the Volodarskiys") brought this putative class action lawsuit against Defendant Delta Air Lines for breach of contract based on Delta's failure to comply with Regulation No. 261/2004 of the European Parliament and European Council (EU 261), which Plaintiffs allege was incorporated into Delta's International Conditions of Carriage. [1] Four other cases founded on similar allegations have been filed in this district by the same plaintiffs' counsel **[*2]** against other airlines. *See Polinovsky v. British Airways PLC*, No. 11 C 779; *Polinovsky v. Deutsche Lufthansa AG*, No. 11 C 780; *Gurevich v. Compagnia Aereas Italiana, SPA*, No. 11 C 1890; *Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*, No. 11 C 775. Delta now moves to dismiss Plaintiffs' complaint pursuant *Federal Rules of Civil Procedure 12(b)(6)*. For the following reasons, Delta's motion [R. 17] is granted.

### I.

In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the Volodarskiys' favor. *Ashcroft v. al-Kidd, __ U.S. __, 131 S. Ct. 2074, 2079, 179 L. Ed. 2d 1149 (2011)*. Plaintiffs Gennaldiy Volodarskiy and his wife Oxana Volodarskaya are Illinois residents who purchased tickets to travel with their children from London's Heathrow Airport to Chicago O'Hare Airport on August 17, 2009. R. 1, Compl. ¶¶ 5, 21. They were confirmed passengers on Delta Flight #DL89, which ended up being delayed at

_____

[1] Jurisdiction is proper under the Class Action Fairness Act, *28 U.S.C. § 1332(d)*.

2012 U.S. Dist. LEXIS 154831, *2

Heathrow for over 8 hours. *Id.* ¶ 22. The Volodarskiys were not informed of this delay any time before the scheduled departure time, and received no compensation **[*3]** from Delta for the delay. *Id.* ¶¶ 23, 25.

The Volodarskiys allege that they were entitled to compensation for this delay under a European Union regulation, known as EU 261, which applies to passengers with confirmed tickets on flights departing from or arriving to airports located in EU member states. EU 261 provides passengers on qualifying flights that are cancelled with a set amount of compensation so long as the cancellation was not caused by unavoidable extraordinary circumstances. [2] *Id.* ¶¶ 9, 10. Although EU 261 does not explicitly provide compensation for flight *delays*, as potentially distinct from *cancellations*, the European Court of Justice (ECJ) has interpreted EU 261 to treat delays longer than three hours as functionally equivalent to cancellations for purposes of compensation. Cases C-402/07 & C-432/07, *Sturgeon v. Condor Flugdienst GmbH*, 2009 E.C.R. I-10923.

The Volodarskiys claim that Delta is required to comply with EU 261 because Delta's International Conditions of Carriage, which govern Delta's international flights, allegedly incorporate EU 261 by reference. Compl. ¶ 38. Specifically, the Volodarskiys contend that incorporation of EU 261 arises from Rules 1(B)(4), 55, and 87 of Delta's International Conditions of Carriage, as well as a document entitled, "European Union — Notice of Your Rights in the Event of Flight Delay or Flight Cancellation," which is posted on Delta's website. *Id.* ¶¶ 16, 17. Because the Volodarskiys did not receive compensation for their delayed flight, they claim that Delta violated its International Conditions of Carriage, **[*5]** and filed this putative class action for breach of

---

[2] However, passengers are not entitled to compensation if they are informed of the cancellation (1) at least two weeks before the scheduled departure time; (2) between two weeks and seven days before the scheduled departure time and are offered rerouting allowing them to depart no more than two hours before the scheduled **[*4]** departure time and to arrive at their final destination no more than four hours after the scheduled arrival time; or (3) within seven days of the scheduled departure time and are offered rerouting allowing them to depart no more than one hour before the scheduled departure time and to arrive at their final destination no more than two hours after the scheduled arrival time. These exceptions do not apply to the Volodarskiys because they were not informed of the delay before the scheduled departure.

contract. *Id.* ¶ 39.

## II.

Under *Federal Rule of Civil Procedure 8(a)(2)*, a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (quotation and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross, 578 F.3d 574, 580 (7th Cir. 2009)* (quoting *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002))*.

"A motion under *Rule 12(b)(6)* challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7, 570 F.3d 811, 820 (7th Cir. 2009)*. "[W]hen a ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)* **[*6]** (citing *Twombly, 550 U.S. at 555-56*); *McGowan v. Hulick, 612 F.3d 636, 638 (7th Cir. 2010)* (courts accept factual allegations as true and draw all reasonable inferences in plaintiff's favor). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555*. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal, 556 U.S. at 678-79*.

## III.

In moving to dismiss the Volodarskiys' breach of contract claim, Delta advances several arguments. First, Delta contends that its flight-services contract with the Volodarskiys confers no right to compensation because it does not incorporate, as a matter of law, EU 261. Second, and in the alternative, Delta asserts that the Volodarskiys' claim is preempted by the Airline

Deregulation Act, *49 U.S.C. § 41713(b)*. Third, Delta argues that dismissal is appropriate because the Volodarskiys have failed to exhaust all other **[*7]** available remedies in the EU prior to filing suit in the United States. As explained below, the first two grounds require dismissal of the complaint.

**A.**

Delta first argues that the Volodarskiys have failed to state a claim upon which relief can be granted because Delta had no contractual obligation to compensate the Volodarskiys for their flight delay. It is undisputed that the terms of Delta's contract with its international passengers, as outlined in Rule 1(A) of Delta's International Conditions of Carriage, are set forth in (1) the passengers' tickets, (2) the Conditions of Carriage, and (3) Delta's published fare rules and regulations. Compl. Exh. 2 at 2. It is also undisputed that nothing in the contract itself explicitly adopts EU 261 or its compensation requirements. [3] What is in dispute is whether the contract incorporates EU 261 by reference, thereby requiring Delta to compensate its international passengers for cancellations and delays in accordance with the EJC's *Sturgeon* decision. Thus, whether the Volodarskiys have alleged a valid breach of contract claim against Delta turns on whether the contract incorporates EU 261 by reference. [4] As explained

---

[3] On this point, Delta's contract is distinguishable from the airline contracts litigated in two otherwise similar cases in this District, *Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*, No. 11 C 775, and *Polinovsky v. Deutsche Lufthansa AG*, No. 11 C 780. In *Giannopoulos*, EU 261 was explicitly incorporated into Iberia's passenger contract, which stated that "[a]s established in [EU 261], compensation is fixed in the event of a flight cancellation unless the latter is due to extraordinary circumstances." *Giannopoulos v. Iberia Lineas Aereas de Espana, S.A., 2011 U.S. Dist. LEXIS 82304, 2011 WL 3166159, at *2 (N.D. Ill. July 27, 2011)*. Similarly, in *Polinovsky v. Deutsche Lufthansa AG*, Judge Coleman found that Lufthansa's Conditions of Carriage explicitly incorporated EU 261 because the Conditions stated that "[i]n the case of a flight cancellation or flight delay, we offer assistance and compensation to the concerned passengers according to [EU 261]." *2012 U.S. Dist. LEXIS 44363, 2012 WL 1080415, at *3 (N.D. Ill. Mar. 30, 2012)*.

[4] To state a breach of contract claim under Illinois law, the Volodarskiys must plead that **[*9]** (1) they had a valid and enforceable contract with Delta; (2) the Volodarskiys performed under the contract; (3) Delta breached the contract; and (4) the Volodarskiys suffered injury as a result of Delta's

---

below, even assuming all **[*8]** of the factual (as distinct from legal) allegations are true, as a matter of law the contract does not incorporate EU 261.

Under Illinois law, a document is incorporated by reference into a contract only if the contract reflects the parties' intent to incorporate the document and make it part of the contract. *Wilson v. Wilson, 217 Ill. App. 3d 844, 577 N.E.2d 1323, 1329, 160 Ill. Dec. 752 (Ill. App. Ct. 1991)*. If so incorporated, those additional provisions become as much part of the contract as if they were expressly written in it. *Id.* (internal citations omitted). The intent to incorporate another document into a contract must be clear and specific. *See, e.g., Jago v. Miller Fluid Power Corp., 245 Ill. App. 3d 876, 615 N.E.2d 80, 82, 185 Ill. Dec. 785 (Ill. App. Ct. 1993)* **[*10]** ("The parties to a contract may incorporate by reference another document if that intention is clearly shown on the face of the contract.").

Here, the Volodarskiys rely on three provisions in Delta's Conditions of Carriage, as well as one document posted on Delta's website, to argue that Delta intended to incorporate EU 261. First, the Volodarskiys point to Rule 1(C)(4) of the Conditions of Carriage, which states that the "Conditions of Carriage are applicable except to the extent that they are contrary to applicable laws, government regulations, or orders, in which event the contrary law, regulation or order shall prevail." Compl. Exh. 2 at 2. But this Rule does not reflect an express intent to incorporate EU 261 into the contract. Rather, Rule 1(C)(4) simply provides that where the applicable law conflicts with the terms of the Conditions of Carriage, the governing law shall, not surprisingly, prevail over the contract terms. It is one thing for a law to trump a contract's contrary terms; it is quite another to consider the law *incorporated* into the contract as if the law were itself one of the contract's terms (instead of merely prevailing over a conflicting term). To hold otherwise **[*11]** would equate a violation of a statute or regulation into a breach of contract, in addition to a violation of the law itself. It is true that a contract can state that a law's provisions are incorporated into the contract itself, as some courts have found as to other airlines' contracts, *see supra* n. 3, but Rule 1(C)(4) in

---

breach. *See Henderson-Smith & Assoc., Inc. v. Nahamani Family Service Center, Inc., 323 Ill. App. 3d 15, 752 N.E.2d 33, 43, 256 Ill. Dec. 488 (Ill. App. Ct. 2001)*. The only issue in dispute is the first element: whether Delta had a valid, enforceable contract with its passengers that required—via incorporation by reference—compliance with EU 261. If so, then Delta's failure to compensate the Volodarskiys for the delay of Delta Flight #DL89 constitutes a breach of contract.

2012 U.S. Dist. LEXIS 154831, *11

Delta's contract says only that the contrary law "prevails," so violations of the law can be pursued as what they are—violation of the law—but not as a breach of contract.

Second, the Volodarskiys assert that EU 261 can be incorporated through Rule 55 of the Conditions of Carriage. Rule 55 expressly incorporates the liability rules of the Montreal Convention, and provides that any provisions of Delta's contract which "may be contrary to a law, government regulation, order or requirement which severally cannot be waived by agreement of the parties . . . shall remain applicable and be considered as part of the contract of carriage to the extent only that such provision is not contrary thereto." Compl. Exh. 2 at 32. But Rule 55 concerns only the Montreal Convention, not EU 261, so Rule 55 expresses no intent to incorporate EU 261 into the contract. Moreover, like Rule 1(C)(4), **[*12]** Rule 55 merely nullifies any contract terms that conflict with applicable laws, regulations, orders, and agreements, and does not incorporate conflicting laws into the contract.

Third, the Volodarskiys rely on Rule 87 of the Conditions of Carriage, which states that "[i]n the event that an involuntary denial of boarding . . . occurs outside the United States of America, and local law applicable at the location of the denied boarding requires a payment of compensation for denied boarding in excess of that set forth in this Rule, Delta will pay the minimum compensation required and in the manner prescribed by local law." *Id.* at 57. The Volodarskiys contend that they were "denied boarding" at Heathrow when their flight was delayed, and thus under Rule 87, they are entitled to compensation as prescribed by EU 261, the governing local law. Their interpretation of "involuntary denial of boarding"—which equates that term with a delay (or a delay so long that it constitutes a cancellation)—flies in the face of that term's plain meaning, and the context of other provisions in the contract. It is clear from Rule 87 that an "involuntary denial of boarding" does not encompass situations where passengers **[*13]** are simply denied boarding at the original scheduled time of departure. Rather, the term only contemplates situations in which Delta has oversold a flight and the ticket holder is unable to board the flight at all. *See, e.g.,* Compl. Exh. 2 at 53 ¶ C ("Delta may involuntary [sic] deny boarding to one or more passengers *on the oversold flight* according to the following boarding priority rules") (emphasis added); *id.* at 55 ¶ E ("When a passenger with a confirmed reservation is involuntarily denied boarding *on an oversold flight* . . . Delta's sole liability to the passenger

shall be to provide alternative transportation . . . and to pay denied boarding compensation, if applicable, pursuant to the terms and conditions of this rule.") (emphasis added). Unlike passengers whose flights are delayed, passengers who are involuntarily denied boarding are simply left behind, even though their flights take off. [5] Because someone is only "involuntarily denied boarding" when a flight is oversold, Rule 87 does not apply to cancellations or delays. Accordingly, Rule 87 does not express a clear intent to incorporate EU 261.

Aside from the provisions found in the Conditions of Carriage, the Volodarskiys' primary contention is that Delta's own rules and regulations reflect an intent to incorporate EU 261. The Volodarskiys argue that Delta's "published fare rules and regulations" include Delta's internal, unilaterally-drafted provisions that are posted on Delta's website. Specifically, the Volodarkiys argue that a document entitled "European Union — Notice of Your Rights in the Event of Flight Delay or Flight Cancellation" ("EU Notice") and posted to Delta's website constitutes a "regulation" and is thus part of Delta's flight-services contract. [6] Delta's EU Notice states that "[t]his notice contains information about your rights established by European Union regulation in the event that you have a confirmed reservation on a flight greater than 3,500 kilometers distance and your flight is delayed beyond its scheduled departure time . . . or your flight is cancelled." Compl. Exh. 3 at 1. The Volodarskiys contend that Delta's EU Notice is incorporated **[*15]** into Delta's passenger contract because Delta's electronic tickets directly hyperlink to Delta's website, where the notice is posted. R. 32, Pl.'s Resp. Br. at 7.

This argument is unavailing. As a threshold matter, the plain language of the "rules and regulations" comprising Delta's passenger contract does not encompass the EU Notice posted on Delta's website. Rule 1(A) of Delta's Conditions of Carriage states that the terms of Delta's contract can be found in the ticket, the Conditions of Carriage, and Delta's "published *fare* rules and

_____

[5] Flight cancellations are also distinguishable from an "involuntary denial of **[*14]** boarding," because there the flight itself never occurs. In other words, passengers are not "denied boarding," because there is no longer any flight to board.

[6] Plaintiffs claim that the EU Notice was originally posted at *www.delta.com/exitEU*, Compl. ¶ 17, but has subsequently been replaced with a new document setting forth passengers' rights related to EU 261 when flights from Europe are cancelled or delayed.

regulations, which may govern the calculation of the fare and other charges that apply to your itinerary." Compl. Exh. 2 at 2 (emphasis added). By its own definition, only Delta's published *fare* rules and regulations are included in Delta's contract. It follows, then, that Delta's rules and regulations that are not related to fare calculations are excluded from Delta's contract (or at least not incorporated **[*16]** by the incorporation of fare rules and regulations). Here, even assuming that Delta's EU Notice is a "regulation," it cannot be considered a *fare* rule or regulation that is part of Delta's contract. Indeed, the EU Notice says nothing about how fares are calculated, but only provides remedies in the event a flight is delayed or cancelled. Compl. Exh. 3. Accordingly, the Court holds that, as a matter of law, Delta's EU Notice is not the type of "regulation" that was intended to be part of Delta's passenger contract.

The Volodarskiys' incorporation argument is further flawed because they have alleged no facts showing that they purchased e-tickets for their trip from London to Chicago. The electronic ticket submitted by Plaintiffs as Exhibit 13 to their Response Brief does not list the Volodarskiys as passengers, and appears to be for a completely different flight than the one for which the Volodarskiys are demanding compensation. *See* Pl.'s Resp. Br. Exh. 13 at 1. In fact, the e-ticket submitted by Plaintiffs is for an October 20-25 round-trip itinerary from New York City to Athens, Greece, not the August 17 flight from London to Chicago on which the Volodarskiys were delayed. *Id.* Without **[*17]** any allegation that the Volodarskiys held electronic tickets for their flight from London, there can be no inference that the Volodarskiys' tickets intended to incorporate the regulations posted on Delta's website.

But even assuming that the Volodarskiys did hold an electronic ticket for their flight from London to Chicago, the complaint does not sufficiently allege that Delta intended to incorporate the EU Notice into the ticket via hyperlink. There are several hyperlinks on the e-ticket to Delta's website—including links to Delta's conditions of carriage, limits on liability for personal injuries, right to change terms of the contract, check-in requirements, limits of liability for delay or failure to perform service, and policy on overbooking flights—but none of them links directly to the EU Notice. *See id.* at 4. Accepting the Volodarskiys' argument would mean that a hyperlink from the e-ticket to Delta's website is sufficient to establish an intent to incorporate any other regulations or documents that may be posted on the website, not just those policies or regulations that are directly linked (if those themselves are even incorporated; a website

link is an impermanent way to enshrine **[*18]** a contract's terms). This is an expansive view of the incorporation doctrine, and one not grounded in Illinois contract law. The intent to incorporate another document into a contract must be clear on the face of the contract. *See, e.g., Jago, 615 N.E.2d at 82*. Had the e-ticket contained a direct hyperlink to the EU Notice on Delta's website, the Volodarskiys might be able to make a colorable allegation of intent to incorporate. But where, as here, there is merely a hyperlink to other pages on Delta's website, there can be no intent to incorporate documents posted elsewhere on Delta's website. Accordingly, this Court holds that the EU Notice is not part of Delta's passenger contract, and as such, EU 261 is not incorporated into the contract via the e-ticket.

Because the Volodarskiys have not established that EU 261 was incorporated by reference into Delta's passenger contract, they have failed to state a claim upon which relief may be granted. The complaint is dismissed.

**B.**

Delta argues that even if the Volodarskiys were able to plead a viable breach of contract claim, their claim is preempted by the Airline Deregulation Act, *49 U.S.C. §41713(b)*. Because the Court has concluded that the **[*19]** Volodarskiys did not adequately plead a contract claim, there is no need to extensively discuss the preemption issue. For the sake of completeness, it turns out that the failure of Plaintiffs to sufficiently allege that EU 261 is incorporated in the contract also serves as the basis to conclude that preemption applies.

To understand this overlap, a brief summary of the Airline Deregulation Act is necessary. In order to ensure that states would not ignore federal airline regulation in favor of regulation of their own, the Act provides that "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." *49 U.S.C. § 41713(b)(1)*. State law causes of action are preempted by the Act when (1) a state seeks to enact or enforce a law that (2) relates to airline rates, routes, or services, either by expressly referring to them or by having a significant economic effect upon them. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1432 (7th Cir. 1996)*. **[*20]** Suits

based on state common law are included for purposes of preemption analysis. *United Airlines, Inc. v. Mesa Airlines, Inc., 219 F.3d 605, 607 (7th Cir. 2000)*.

The Supreme Court carved out an exception to preemption under the Airline Deregulation Act for routine breach of contract claims "seeking recovery solely for [an] airline's alleged breach of its own, self-imposed undertakings." *American Airlines, Inc. v. Wolens, 513 U.S. 219, 228, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995)*. Under *Wolens*, to avoid preemption, a breach of contract claim must be based on the parties' own contract, with no enlargement or enhancement through state laws or policies external to the agreement. *Id. at 233*. In such cases, the remedy is limited to the terms of the parties' agreement, and does not require the enforcement of a state law or policy external to the agreement. Thus, whether a claim is preempted by the Airline Deregulation Act turns on whether the right to be enforced stems from an external state law or policy or an internal restriction imposed by the parties' own agreement.

Here, Delta argues that because resolving the Volodarskiys' breach of contract claim would require the Court to look outside the parties' contract to "policies **[*21]** external to the agreement" (here, EU 261), the claim is preempted by the Act. Although ultimately Delta is correct that preemption applies here, the fact that a regulation is literally outside the contract's own terms does not necessarily end the inquiry. Our colleagues in this District have held that where a regulation is expressly incorporated into the terms of a contract, it is not an "external policy" for purposes of ADA preemption. *See, e.g., Polinovsky v. Deutsche Lufthansa AG, 2012 U.S. Dist. LEXIS 44363, 2012 WL 1080415, at *3 (N.D. Ill. Mar. 30, 2012)*; *Giannopoulos v. Iberia Lineas Aereas de Espana, S.A., 2011 U.S. Dist. LEXIS 82304, 2011 WL 3166159, at *3 (N.D. Ill. July 27, 2011)*. In *Polinovsky*, the plaintiffs brought a similar breach of contract claim against Lufthansa for its failure to comply with EU 261. In response, Lufthansa argued that the plaintiffs' claim was preempted by the Airline Deregulation Act, because EU 261 was a policy external to the contract itself. The court in *Polinovsky* disagreed, holding that because Lufthansa's contract specifically referenced EU 261 and the contract included language stating Lufthansa's intent to comply with EU 261's compensation requirements as part of the contract itself, the obligation **[*22]** to compensate passengers was part of Lufthansa's own undertaking. *2012 U.S. Dist. LEXIS 44363, 2012 WL 1080415, at *3*. As such, the court there held that the plaintiff's breach-of- contract

claim fell within the *Wolens* exception and was not preempted by the Airline Deregulation Act. *Id.* Similarly, in *Giannopoulos*, the court determined that because Iberia voluntarily agreed to abide by EU 261 by incorporating it into its contract, Iberia's obligation to compensate delayed passengers was a self-imposed undertaking that fits within the *Wolens* exception. *2011 U.S. Dist. LEXIS 82304, 2011 WL 3166159 at *3*. Moreover, because Iberia agreed in its contract to pay compensation "as established in EU 261," and because the ECJ's decision in *Sturgeon* is the binding interpretation of EU 261, Iberia's contract must be read as an agreement to abide by EU 261, as interpreted by the ECJ. *Id.* Accordingly, the court concluded that the ECJ's decision in *Sturgeon* is not external to the contract for preemption purposes. *Id.*

Based on the courts' holdings in *Polinovsky* and *Giannopoulos*, EU 261 can only be considered a self-imposed undertaking under the *Wolens* exception if it is incorporated by reference into Delta's contract. And, as discussed in the previous section, **[*23]** the Volodarskiys have not adequately alleged that Delta intended to incorporate EU 261 into its International Conditions of Carriage. Had Delta explicitly incorporated EU 261 into its contract as a part of the contract itself, the rationale of *Polinovsky* and *Giannopoulos* support concluding that the Volodarskiys' breach-of-contract claim is not preempted by the Act. But because the language of Delta's contract is distinguishable from that found in *Polinovsky* and *Giannopoulos*—namely, that it does not expressly mention or incorporate EU 261—the *Wolens* exception does not apply, and the Volodarskiys' breach of contract claim is preempted by the Airline Deregulation Act. [7] Thus, for the reasons discussed above, the Volodarskiys' failure to establish Delta's clear intent to incorporate EU 261 into its contract is independently fatal to Plaintiffs' breach-of-contract claim. [8]

## IV.

For the reasons stated above, Delta's motion to dismiss

---

[7] We note again that preemption under the ADA merely provides an alternative ground for granting dismissal.

[8] Delta offers a third ground for dismissal based on the Volodarskiys' failure to exhaust all available remedies in the EU prior to filing suit in the United States. This Court need not reach the issue of exhaustion, **[*24]** since, as discussed above, the Volodarskiys' claim fails for other reasons.

2012 U.S. Dist. LEXIS 154831, *24

[R. 17] is granted. If the Plaintiffs wish to seek leave to file an amended complaint, they must file a motion by November 26, 2012, and notice it for presentment on December 3, 2012 at 9 a.m. If no motion is filed, then dismissal will be granted with prejudice as of that date without further order of the Court. The status hearing of October 30, 2012 is reset to December 3, 2012 at 9 a.m., to track the case.

ENTERED:

/s/ Edmond E. Chang

Honorable Edmond E. Chang

United States District Judge

DATE: October 29, 2012

---

**End of Document**

# EXHIBIT 5



Neutral
As of: January 25, 2023 8:33 PM Z

# *NCA Investors Liquidating Trust v. TD Bank, N.A. (In re Seaboard Hotel Member Assocs., LLC)*

United States Bankruptcy Court for the District of Delaware

November 25, 2019, Decided

Chapter 11, Case No. 15-12510 (LSS), (Jointly Administered), Adv. No. 17-51857

**Reporter**
2019 Bankr. LEXIS 3632 *

In re: SEABOARD HOTEL MEMBER ASSOCIATES, LLC, et al., Post-Effective Date Plan Debtors. NCA INVESTORS LIQUIDATING TRUST, Plaintiff, vs. TD BANK, N.A., Defendant.

## Core Terms

allegations, funds, customer's, transfers, aiding and abetting, banking, depository, motion to dismiss, breach of fiduciary duty, entities, district court, impose a duty, investors, weighing, monitor, substantial assistance, duty of care, reckless, courts, public policy, argues, unfair, foreseeable, documents, amend, real estate, red flag, indifference, fraudulent, perpetrate

## Case Summary

**Overview**
HOLDINGS: [1]-The trust had not adequately pled negligence because while the harm alleged by the trust may have been foreseeable, public policy did not support imposing a duty of care on banks to undertake investigations into corporate affairs of their customers with depository accounts; [2]-Regarding the aiding and abetting breach of fiduciary duty claim, the trust had not alleged that the bank owed a fiduciary duty to debtors that would have required the bank to take action.

**Outcome**
Bank's motion granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers &

Objections > Motions to Dismiss > Failure to State Claim

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN1*[ ] **Motions to Dismiss, Failure to State Claim**

A court's job on a *Fed. R. Civ. P. 12(b)(6)* motion is to review the complaint to determine whether the plaintiff has adequately pled facts sufficient to show that the plaintiff has a plausible claim for relief. In reviewing the complaint under *Rule 12(b)(6)*, the court must first accept all well-pled facts as true, but may disregard legal conclusions. A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. It is not sufficient to plead threadbare recitals of the elements of a cause of action supported by mere conclusory statements. Rather, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory. A court draws on its judicial experience and common sense to determine if the complaint meets these requirements. The moving party has the burden.

Torts > ... > Elements > Duty > Standards of Care

*HN2*[ ] **Duty, Standards of Care**

Connecticut courts recognize that banks generally owe a duty of care to their customers. The duty of care arises out of the contractual relationship between the bank and its customer and applies to its transactions with its customer. So, for example, Connecticut courts have found a bank to be negligent when it did not follow its policies and procedures to verify that accounts were

2019 Bankr. LEXIS 3632, *3632

properly opened, when a bank permits a withdrawal by someone who is not authorized to access the customer's account or when a bank pays proceeds to an improper payee.

Torts > ... > Standards of Care > Appropriate Standard > Province of Court & Jury

*HN3*[↓] **Appropriate Standard, Province of Court & Jury**

Within the concept of duty, there are two separate considerations: the existence of the duty and the scope of the duty. Under Connecticut law, the existence of a legal duty is a two-part analysis: The test for existence of a legal duty of care entails: (i) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. The existence of a legal duty is a question of law and is appropriately decided on a motion to dismiss.

Torts > Negligence > Elements > Duty

*HN4*[↓] **Elements, Duty**

Connecticut courts do not generally impose a duty to monitor depository bank accounts. Further, the Connecticut Supreme Court has also recognized that a debtor/creditor relationship does not impose any special duty of care for the safekeeping of the funds on deposit.

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

*HN5*[↓] **Concerted Action, Civil Aiding & Abetting**

To establish a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege that: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be

generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation.

Torts > Intentional Torts > Breach of Fiduciary Duty > Elements

*HN6*[↓] **Breach of Fiduciary Duty, Elements**

Connecticut law show that Connecticut uses a "general awareness" standard for the requisite knowledge of the underlying breach of fiduciary duty.

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

*HN7*[↓] **Concerted Action, Civil Aiding & Abetting**

In order to show that an alder and abettor was generally aware that he was part of tortious activity, a plaintiff must show that defendant has either actual knowledge of the underlying tort or that he acts with reckless indifference to the possibility that the underlying tort is occurring.

Torts > ... > Multiple Defendants > Concerted Action > Civil Aiding & Abetting

*HN8*[↓] **Concerted Action, Civil Aiding & Abetting**

To plead substantial assistance, a plaintiff must come forward with allegations that the assistance provided by the alleged aider and abettor was a substantial factor in bringing about the violation. Connecticut courts have recognized that the mere inaction or continued participation in a transaction on the part of the defendant does not constitute substantial assistance. In other words, the defendant must take some affirmative steps to further the breach of fiduciary duty. An exception to this rule is when the defendant itself owes a fiduciary duty to the plaintiff.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation

Civil Procedure > ... > Pleadings > Heightened
Pleading Requirements > Fraud Claims

**HN9**[ ] **Deceptive & Unfair Trade Practices, State
Regulation**

The the Connecticut Unfair Trade Practice Act (CUTPA)
regulates unfair or deceptive acts or practices taking
place in Connecticut. *Section 42-110b* of Unfair Trade
Practices Act provides that (a) no person shall engage
in unfair methods of competition and unfair or deceptive
acts or practices in the conduct of any trade or
commerce. *Conn. Gen. Stat. § 42-110b(a)*. To plead a
CUTPA claim, a plaintiff must allege: (1) ascertainable
loss of money or property, (2) causation, and (3) an
unfair method of competition or an unfair or deceptive
act in the conduct of any trade or commerce.
Additionally, to survive a motion to dismiss, a plaintiff
does not have to meet the heightened standard of *Fed.
R. Civ. P. 9(b)*.

Civil Procedure > ... > Pleadings > Amendment of
Pleadings > Leave of Court

**HN10**[ ] **Amendment of Pleadings, Leave of Court**

Leave to amend is freely granted, unless an amendment
would be inequitable or futile.

**Counsel:** **[*1]** For Seaboard Hotel Member Associates,
LLC, Debtor (15-12510-LSS): Robert S. Brady, Young,
Conaway, Stargatt & Taylor, LLP, Wilmington, DE;
Efrem Z Fischer, Klein & Solomon, LLP, New York, NY;
Sean T. Greecher, Young, Conaway, Stargatt & Taylor,
Wilmington, DE; Elizabeth Soper Justison, Young
Conaway, Wilmington, DE; Maris J. Kandestin, DLA
Piper LLP (US), Wilmington, DE; Gilbert R. Saydah, Jr.,
Montgomery McCracken Walker & Rhoads LLP,
Wilmington, DE; Jeffrey M. Sklarz, Green & Sklarz LLC,
New Haven, CT.

For NCA Investors Liquidating Trust, Plaintiff (17-51857-
LSS): Douglas N. Candeub, Brett D. Fallon, Morris
James LLP, Wilmington, DE; Lauren McNair, Green &
Sklarz, LLC, New Haven, CT; Jeffrey M. Sklarz, LEAD
ATTORNEY, Green & Sklarz LLC, New Haven, CT.

For TD Bank, N.A., Defendant (17-51857-LSS): Derek
C. Abbott Morris, Nichols, Arsht & Tunnell, Wilmington,
DE; Mark W. Kinghorn, LEAD ATTORNEY, Charlotte,
NC; Jarrod D. Shaw, LEAD ATTORNEY, Pittsburg, PA.

**Judges:** Laurie Selber Silverstein, United States

Bankruptcy Judge.

**Opinion by:** Laurie Selber Silverstein

# Opinion

## MEMORANDUM

TD Bank, N.A. ("Defendant" or "TD Bank") filed a motion
to dismiss this adversary proceeding[1] ("Motion to
Dismiss").[2] Briefing is complete[3] and I **[*2]** heard oral
argument. For the reasons set forth below, I will grant
the Motion to Dismiss, but give Plaintiff an opportunity to
amend the Complaint.[4]

## Background

Plaintiff is a trust created pursuant to that certain
Amended Chapter 11 Plan of Liquidation filed in the
jointly administered cases under the caption *In re
Newbury Commons Associates, LLC*, Case No. 15-
12507. The trust may pursue claims for the benefit of
the Plan Debtors, which is a subset of the jointly
administered debtors.

As recounted in the Complaint,[5] Debtors were limited
liability companies created by John J. DiMenna, Jr.

---

[1] All references to the Adversary Proceeding Docket will be
cited as "D.I."

[2] Defendant TD Bank, N.A.'s Motion to Dismiss the Adversary
Complaint, February 9, 2018, D.I. 10.

[3] Defendant TD Bank, N A 's Memorandum of Law in Support
of Its Motion to Dismiss the Adversary Complaint, February 9,
2018, D.I. 11 ("Opening Brief"); Plaintiff's Memorandum of Law
in Opposition to Defendant TD Bank, N.A.'s Motion to Dismiss,
March 2, 2018, D.I. 20 ("Answering Brief"); Defendant TD
Bank, N.A.'s Reply in Support of Motion to Dismiss the
Adversary Complaint, March 16, 2018, D.I. 22 ("Reply Brief").

[4] Complaint by NCA Investors Liquidating Trust against TD
Bank, N.A., December 8, 2017, D.I. 1.

[5] As required on a motion to dismiss the facts recited herein
are taken from the Complaint. *Pension Benefit Guar. Corp. v.
White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.
1993)*. A court is not required to make findings of fact or
conclusions of law on a motion to dismiss under *Fed. R. Civ.
P. 12*, made applicable by *Fed. R. Bankr. P. 7012*, and I make
none. *See Fed. R. Civ. P. 52(a)(3)*, made applicable by *Fed.
R. Bankr. P. 7052*.

("DiMenna"), William A Merritt, Jr. ("Merritt") and Thomas L. Kelly, Jr. ("Kelly") to each hold a separate piece of real estate located in Connecticut. DiMenna, Merritt and Kelly were also co-managing members of another entity, Seaboard Realty LLC ("Seaboard"), which managed each of the Debtors and also held an equity interest in many of the Debtors. More than 100 individual investors also held equity interests in one or more of the Debtors.

More precisely, and as detailed and depicted in a schematic in the Complaint, through various Debtor entities, DiMenna, Merritt and Kelly bought ten separate parcels **[*3]** of developed real estate used for various commercial activities.[6] The investment vehicles established for each parcel of real estate consisted (generally) of a holding company and a wholly owned subsidiary. Seaboard and the individual investors held their equity interests at the holding company level. The real estate was owned by the wholly owned subsidiary. Plaintiff refers to each of these separate structures as a "silo."

Merritt's and Kelly's investment philosophy was that each investment was a stand alone opportunity which depended on the performance of its real estate. As such, investors invested in one or more specific properties, not in a portfolio of real estate. Plaintiff alleges that each Debtor's operating agreement prohibited Seaboard (as the manager) from commingling investments and/or diverting money from one investment to fund operations of, or pay distributions to investors of, another investment. If an investment was successful, its investors would receive a return on their investment; if it was not, they would not.

While Seaboard was the named manager of each Debtor entity, in reality, DiMenna, through his wholly owned entity, Seaboard Property Management, Inc., performed **[*4]** the day- to-day management functions. Without the knowledge of Merritt, Kelly and the individual investors, "since 2012" DiMenna knew that many of the properties were not cash flow positive, and he began commingling funds among the investments and subsidizing disbursements from non-performing investments with revenue from performing investments. Because of this "massive fraud," Debtors and their

investors lost more than $70 million.[7]

Plaintiff asserts that TD Bank played a role in the massive fraud. Plaintiff alleges that since at least 2008, Debtors used TD Bank as their main depository bank. The relationship began when DiMenna's banker, Sten Sandlund ("Sandlund"), left his previous employer and joined TD Bank.[8] DiMenna and Sandlund had a "close relationship" and Plaintiff alleges (on information and belief)[9] that Sandlund "was aware that the investments were to be siloed." Mr. Sandlund left TD Bank in 2012, but Debtors retained their depository accounts at TD Bank.

DiMenna established an account at TD Bank in the name of Seaboard Consolidated, LLC and used this account to transfer funds from one debtor entity to another. Seaboard Consolidated was wholly owned by DiMenna **[*5]** and had no operations. Plaintiff alleges that it was a mere conduit through which DiMenna ran his illegal operations. Funds would be transferred from various debtor entities into the Seaboard Consolidated account and then into the account of a debtor who had an immediate need for funds. Plaintiff alleges that tens of millions of dollars flowed through the Seaboard Consolidated account "very quickly." Plaintiff further alleges that (i) various Debtors frequently bounced checks or had insufficient funds in their accounts; (ii) TD Bank was aware that Debtors were frequently transferring funds among each other; (iii) accounts had a high volume of activity and carried low balances, "a classic red flag for improper financial activity," (iv) TD Bank permitted DiMenna to frequently transfer funds between Debtors' accounts to cover overdrafts even

_____

[6] The real estate included a Marriot Courtyard, a Marriot Residence Inn, several office buildings (some with retail space), a condominium building, and several apartment buildings.

_____

[7] DiMenna pled guilty to two counts of wire fraud and was awaiting sentencing at the time this matter was briefed. Opening Brief 5 n.4.

[8] Sandlund left TD Bank for Israel Discount Bank in 2012.

[9] Pleading upon information and belief is circumstantially sufficient to satisfy federal notice pleading standards under _Fed. R. Civ. P. 8(a)_, made applicable by _Fed. R. Bankr. P. 7008. See Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)_ ("The Twombly plausibility standard, which applies to all civil actions, . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief where the facts are peculiarly within the possession and control of the defendant.") (citations omitted; internal quotation marks omitted); _see generally Bell Ad. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)._

though it was clear each debtor was an individual company; (v) TD Bank was aware that once deposits were made, the funds were frequently remitted elsewhere leaving only small amounts in the accounts "another red flag" of improper financial activity; and (vi) TD Bank was aware that Seaboard Consolidated did nothing more than pass money back and forth **[*6]** among Debtors Finally, Plaintiff alleges that TD Bank never froze any debtor accounts "despite concerns over account activity."

In November, 2015, Merritt and Kelly became aware that DiMenna had been misrepresenting Debtors' operations and finances. Ultimately, Merritt and Kelly caused Debtors to file voluntary bankruptcy petitions over the period of December 13, 2015 through March 17, 2016.

## Jurisdiction

Subject matter jurisdiction exists over these adversary proceedings pursuant to _28 U.S.C. § 1334(b)._ Plaintiff takes the position that this matter is either a core proceeding or a non-core proceeding.[10] Plaintiff further states that "at this time" it does not consent to my entry of final orders or judgments if it is determined that the bankruptcy court cannot enter final order or judgments consistent with the Constitution absent consent. Defendant takes no position on the nature of the action, and makes no statement regarding consent.

This matter is non-core. In Count I of the Complaint, Plaintiff alleges that Defendant was negligent in maintaining and overseeing Debtors' depository accounts. In Count II of the Complaint, Plaintiff alleges that Defendant aided and abetted the breach of DiMenna's fiduciary **[*7]** duty by acting with reckless disregard toward the wrongdoing and by providing substantial assistance to DiMenna. In Count III of the Complaint, Plaintiff alleges that Defendant violated the _Connecticut Unfair Trade Practice Act ("CUTPA")_ by allowing Seaboard Consolidated to carry out improper transactions. Each Count states an action under applicable state law and could have been brought even if the bankruptcy cases had not been filed. As such, absent consent, I cannot enter a final order or judgment in this adversary proceeding.

_____

[10] Complaint ¶ 2.

### The Relevant Standard

In the Motion to Dismiss, brought under _Rule 12(b)(6),_[11] Defendant moves to dismiss Count I on three grounds: (i) Plaintiff failed to state a claim for negligence; (ii) Defendant has no duty to monitor depository accounts; and (iii) there is no private right of action based on banking procedures.[12] Next, Defendant moves to dismiss Count II of the Complaint because (i) Connecticut law does not recognize a cause of action for aiding and abetting breach of fiduciary duty as actionable and (ii) Plaintiff failed to plead the elements of the aiding and abetting breach of fiduciary duty claim. Lastly, Defendant moves to dismiss Count III of the Complaint because **[*8]** (i) Plaintiff merely recited the elements of a CUTPA violation and (ii) Plaintiff failed to plead an unfair or deceptive act as required under CUTPA. Thus, by the Motion to Dismiss, Defendant asserts that Plaintiff has failed to state a claim.[13]

_HN1_[⬆] ] My job on a _Rule 12(b)(6)_ motion is to review the complaint to determine whether the plaintiff has adequately pled facts sufficient to show that the plaintiff "has a 'plausible claim for relief.'"[14] In reviewing the complaint under _Rule 12(b)(6),_ the court must first accept all well-pled facts as true, but may disregard legal conclusions.[15] "A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[16] It is not sufficient to plead "

_____

[11] _Fed. R. Civ. P. 12,_ made applicable by _Fed. R. Bankr. P. 7012._

[12] Plaintiff is not advancing this argument so I need not discuss it.

[13] In the alternative, Defendant seeks to dismiss the Complaint pursuant to the doctrine of _in pari deficit._ Given my ruling, I need not address this defense now.

[14] _THQ Inc. v. Starcom Worldwide, Inc. (In re THQ Inc.), No. 12-13398 (MFW), Adv. No. 14-51079 (MFW), 2016 Bankr. LEXIS 1774, 2016 WL 1599798, at *2 (Bankr. D. Del. Apr. 18, 2016);_ see _Iqbal, 556 U.S. at 678_ (although detailed factual allegations are not required, the complaint must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.") (citation omitted).

[15] See _In re THQ, Inc., 2016 Bankr. LEXIS 1774, 2016 WL 1599798, at *2._

[16] _Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc., C.A. No. 14-874—SLR—SRF, 2015 U.S. Dist. LEXIS 85279,_

hjhreadbare recitals of the elements of a cause of action[] supported by mere conclusory statements . . . "[17] Rather, "a complaint . . .must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."[18] A court draws on "its judicial experience and common sense" to determine if the complaint meets these requirements.[19] The moving party has the burden. **[*9]** [20]

**Discussion**[21]

**Count Negligence**

**HN2**[⬆️] Connecticut courts recognize that banks generally owe a duty of care to their customers.[22] The duty of care arises out of the contractual relationship between the bank and its customer and applies to its transactions with its customer.[23] So, for example, Connecticut courts have found a bank to be negligent when it did not follow its policies and procedures to verify that accounts were properly opened,[24] when a bank permits a withdrawal by someone who is not authorized to access the customer's account[25] or when a bank pays proceeds to an improper payee.[26] Here, Plaintiff does not assert a breach of the duty of care arising out of its contract with TD Bank nor does it assert that DiMenna was not authorized to make the alleged improper transfers.

Instead, Plaintiff asserts a common law claim of negligence, seeking damages for Defendant's negligent handling of Debtors' depository accounts. In response, Defendant asserts that a bank has no duty of care to monitor its customer's transactions and that Plaintiff is asking me to create a duty of care where none exists.[27] Plaintiff expressly concedes that a bank has no **[*10]** general duty to monitor activities in a depository account,"[28] but argues that Connecticut law provides that "banks must not ignore patently fraudulent conduct perpetrated by customers they know well."[29] Plaintiff asserts that "to state a claim for negligence against a bank concerning a deposit account, the plaintiff must set forth the traditional elements of negligence as well as

---

*2015 WL 4036951, at \*5 (D. Del. July 1, 2015)* (citing *Iqbal, 556 U.S. at 663*; *Twombly, 550 U.S. at 555-56*).

[17] *Iqbal, 556 U.S. at 678*.

[18] *Twombly, 550 U.S. at 562* (quoting *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984))*.

[19] *In re THQ, Inc., 2016 Bankr. LEXIS 1774, 2016 WL 1599798, at \*2* (quoting *Burtch v. Huston (In re USDigital, Inc.), 443 B.R. 22, 35 (Bankr D Del. 2011))*.

[20] *In re THQ, Inc., 2016 Bankr. LEXIS 1774, 2016 WL 1599798, at \*2*.

[21] Both parties cite to Connecticut law as the applicable substantive law. Opening Brief 6 & n.4; Answering Brief 8. Accordingly, I will analyze the Complaint using Connecticut substantive law.

[22] *Red Law Firm, LLC v. Webster Bank, 2014 Conn. Super. LEXIS 333, 2014 WL 1011940 at \*3 (Conn. Super. Feb. 7, 2014)* ("Although our appellate courts have not yet ruled on this issue, judges of the Superior Court 'have . . . . recognized that banks generally owe a duty of care to theft customers, regardless of whether a plaintiff asserts common law or statutory claims against a bank.") (citing *Lester Constr., LLC v. People's United Bank, 2009 Conn. Super. LEXIS 3518, 2009 WL 5698131 (Conn. Super. 2009))*.

[23] *Id.*

---

[24] *Lester Constr., LLC v. Peoples United Bank, 2009 Conn. Super. LEXIS 3518, [WL] at \*3* ("[A]n interest holder in a corporation took delivery of checks made payable to the corporation and to the corporation's director, and opened an account in the name of the corporation at a local bank. . . . The interest holder then drew checks on the account.") (citations omitted).

[25] *St. Bernard Sch. of Montville, Inc. v. Bank of Am., 312 Conn. 811, 95 A.3d 1063 (Conn. 2014)*.

[26] *Red Law Firm, LLC v. Webster Bank, 2014 Conn. Super. LEXIS 333, 2014 WL 1011940 at \*5* ("[T]he four public policy factors discussed above support imposing a duty on a bank to take reasonable steps to determine that an instrument presented for payment is endorsed and that the individual presenting it is the named payee.").

[27] Opening Brief 7 citing *Frigon v. Enfield Say. And Loan Ass'n, 195 Conn. 82, 486 A.2d 630, 633 (Conn. 1985)* ("The fact that a bank is indebted to its account holders for the amount of the funds that they have deposited imposes no special duty of care for the safekeeping of the funds on deposit.") (citations omitted).

[28] Answering Brief 12 n.8.

[29] *Id.* (further asserting that "had DiMenna been anyone else, there is virtually no chance that TDB would have allowed what occurred to have happened.").

allegations that there was some additional relationship between the bank and the depositor."[30]

Plaintiff asserts that the following allegations in the Complaint establish that additional relationship:
- TD Bank was Debtors' main bank since 2008. Complaint ¶ 28.
- Sandlund and DiMenna had a close relationship and Sandlund was aware that the investments were supposed to be "siloed." Complaint ¶ 31.

Plaintiff argues that because of this relationship, TD Bank permitted funds to be improperly transferred between and among Debtor accounts through Seaboard Consolidated, ignored various "red flags" of improper account activity and deviated from normal banking procedures and protocols established to detect and stop illegal and improper activities. At argument, Plaintiff further distilled its negligence argument. [*11] Plaintiff asserted TD Bank permitted an unauthorized use of the funds in Debtors' accounts because Debtors' constituent documents prohibited Debtors from using revenue from one project to pay debts of another project.

Defendant contends that Plaintiff has not pled the "additional relationship" that must exist to state a claim of negligence against a bank. As to Plaintiff's further argument that TD Bank permitted an unauthorized use of funds based on Debtors' constituent documents, Defendant contends that an unauthorized transaction cannot be based on the customer's internal documents, but only on the customer's contract with the bank.

Plaintiff cites *Murdock v. Croughwell* as the negligence standard to apply to TD Bank's conduct and the well-established elements of a negligence action: duty, breach of that duty, causation and damages.[31] HN3[↑] Within the concept of duty, there are two separate considerations: the existence of the duty and the scope of the duty.[32] Under Connecticut law, the existence of a

legal duty is a two-part analysis:

> T]he test for existence of a legal duty of care entails: (i) a determination of whether an ordinary person in the defendant's position, knowing what the defendant [*12] knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.[33]

The existence of a legal duty is a question of law and is appropriately decided on a motion to dismiss.[34]

While citing the standard, neither party performed Connecticut's two-part analysis to determine the existence of a duty. I am guided in this analysis by the United States District Court for the District of Connecticut's recent decision in *White v. Wells Fargo Bank*.[35] In *White v. Wells Fargo Bank*, the district court denied a pro se plaintiff's motion to amend her complaint concluding that to do so would be futile because the underlying legal theories were fundamentally flawed. One of the plaintiff's theories was that Wells Fargo failed to exercise reasonable care in the assessment of her request for a mortgage modification under the Home Affordable Modification Program ("HAMP") regulations. The district court stated that there were no Connecticut [*13] Supreme Court or Appellate Court decisions recognizing liability for a bank's failure to exercise reasonable care in denying a

---

[30] Answering Brief 8-9. Plaintiff is correct. *See e.g. St. Bernard Sch. of Montville, Inc. v. Bank of Am., 312 Conn. 811, 95 A3d 1063, 1078 (Conn. 2014)* (examining whether "some special relationship other than a fiduciary relationship" existed between a bank and a depositor for purposes of determining whether a statute of limitations was tolled).

[31] *Murdock v. Croughwell, 268 Conn. 559, 848 A.2d 363, 367 (Conn. 2004)* cited for the applicable standard page 8-9 of the Answering Brief.

[32] *McDermott v. State, 316 Conn. 601, 113 A.3d 419, 425*

*(Conn. 2015)* (citing *LePage v. Horne, 262 Conn. 116, 809 A.2d 505 (Conn. 2002))*.

[33] *Murdock v. Croughwell, 848 A.2d at 367*; *Blanco v. Bank of America, N.A., 2016 WL 2729319, at *4 (Conn. Superior Court 2016)*.

[34] *Id.* ("duty is a legal conclusion about relationships between individuals, made after the fact . . . ."); *Blanco v. Bank of America, N.A., 2016 WL 2729319, at *4 (Conn. Superior Court 2016)* ("The issue of whether the defendant owed the plaintiff a duty of care is an appropriate one for a motion to strike because the question embodies a matter of law to be decided by the court.") (citing *Bennett v. Connecticut Hospice, Inc., 56 Conn. App. 134, 741 A.2d 349 (Conn App. 1999)*, *cert. denied*, **252 Conn. 938, 747 A.2d 2 (2000))**. A motion to strike is Connecticut's equivalent of a motion to dismiss.

[35] *White v. Wells Fargo Bank, N.A., 2019 U.S. Dist. LEXIS 123810, 2019 WL 3334533 (D. Conn. July 25, 2019)*.

2019 Bankr. LEXIS 3632, *13

customer's application to a non-mandatory program. But, because the plaintiff alleged a duty of care as a HAMP recipient, the court assessed Wells Fargo's duty under Connecticut's two-part test.

First, the district court analyzed whether the plaintiff's injury (foreclosure) was a foreseeable result of Wells Fargo's denying her financial assistance through HAMP. The district court determined it was foreseeable that a party in Wells Fargo's position knowing the plaintiff's financial information (or the information the bank should have known) "would reasonably anticipate the general harm of a foreclosure action resulting from denying a HAMP program application." Accordingly, the district court concluded that the plaintiff met the first part of the duty inquiry.

Second, the district court set out the four factors Connecticut courts examine to determine whether public policy mandates that the defendant's negligent conduct should extend to the particular consequences or particular plaintiff in the case: "(1) the normal expectations of the participants in the activity [*14] under review;" (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions."[36] In turn, the district court concluded that: (i) because there is no fiduciary relationship in a borrower/lender relationship between a bank and its customer, there can be no normal expectation that a consumer is entitled to enroll in HAMP or that a bank would be liable for denying a HAMP application (weighing against the existence of a duty); (ii) there is a public policy of encouraging consumers to participate in public assistance programs (weighing in favor of the existence of a duty); (iii) recognizing personal liability for banks that deny HAMP applications would increase litigation (weighing against the existence of a duty); and (iv) while there were no helpful decisions from other jurisdictions, the "Connecticut Supreme Court has denied past attempts to create an amorphous duty of care from a contractual relationship" (weighing against the existence of a duty). The district court concluded that while Wells Fargo could have foreseen the plaintiff's injury, Connecticut's [*15] public policy did not support imposing a duty of care on banks because of a denial of a customer's application to a non-mandatory program. Accordingly, the district court held that the plaintiff did

not plead sufficient facts to state a plausible claim for relief under *Twombly*.

In the present case, Connecticut's two-part analysis results in the same conclusion. As to the first prong, the injury sustained by Plaintiff due to TD Bank's alleged conduct is described by plaintiff as a massive fraud causing losses of more than $ 70 million. Plaintiff argues that TD Bank knew the entities were "siloed" and thus they "had a basis for awareness of the intercompany transfers that effectuated the fraudulent scheme." Plaintiff also contends that a pattern of improper transfers occurred which TD Bank ignored and which were obvious "red flags."

Under these circumstances, an ordinary person in TD Bank's position (i.e. a reasonable banker[37] ), knowing what TD Bank is alleged to know, might believe that the transfers, which were properly authorized, were properly accounted for.[38] But, I cannot rule out that a reasonable banker, knowing what TD Bank is alleged to know, might also anticipate the harm alleged [*16] here—an illegal activity. While Defendant argued (and Plaintiff did not counter) that there is no private action based on internal policies and procedures or statutory requirements such as the *Bank Secrecy Act*, the existence of internal policies and procedures and statutory requirements designed to detect and expose suspicious activities suggests that a foreseeable harm of those suspicious activities is illegal conduct. Plaintiff, therefore, has met the foreseeability prong of the duty inquiry.

But, Plaintiff does not meet the second prong of the duty inquiry as I conclude that public policy does not support imposing a duty on TD Bank under the circumstances pled. The first factor is "the normal expectations of the participants in the activity under review." The activity under review here is TD Bank's actions or lack of action in monitoring its customers' depository accounts. Plaintiff has recognized that *HN4* Connecticut courts do not generally impose a duty to monitor depository bank accounts. Further, the Connecticut Supreme Court has also recognized that a debtor/creditor relationship

---

[36] *Murillo v. Seymour Ambulance Ass'n, Inc., 264 Conn. 474, 480, 823 A.2d 1202 (2003)*.

---

[37] *See e.g. Red Law Firm 2014 Conn. Super. LEXIS 333, [WL] at *4* (analyzing whether a "reasonable bank agent" would anticipate the alleged harm).

[38] The four pages of the Disclosure Statement attached to the Complaint and incorporated therein state that Debtors tracked the account activity and reflected the activity as intercompany loans in the aggregate as part of the entities' tax returns.

"does not impose any special duty of care for the safekeeping of the funds on deposit."[39]

Plaintiff urges me to find that the parties' relationship extended beyond a simple depository relationship because of the length of the depository relationship and because Sandlund knew that the investments were supposed to be siloed. Citing *Marino v. Bank of America*,[40] Plaintiff argues that allegations of a long banking relationship with "the bank act[ing] as an advisor or when the bank gains the confidence of the account holder" states a claim for negligence. Plaintiff further states that such allegations exist here. But, they do not. Here, Plaintiff alleges nothing more than DiMenna knew Sandlund and they maintained a long banking relationship. There is no allegation that Sandlund or TD Bank acted as Debtors' advisor or gained Debtors' confidence. Rather, Plaintiff alleges nothing more than a traditional depository relationship. Other cases Plaintiff cites address unauthorized withdrawal, i.e. a breach of the contractual relationship between the customer and the bank.[41]

Plaintiff also likens the posture of this case to *Coquina v. TD Bank* [42] in which a trial court denied a motion to dismiss claims for fraud and aiding and abetting. In *Coquina*, the plaintiff brought an action against a bank **[*18]** alleging violation of the *Racketeering Influenced and Corrupt Organization Act ("RICO")*, conspiracy to violate RICO, fraudulent misrepresentation and aiding and abetting. The plaintiff alleged that several senior bank officers and employees actively participated in the illegal activity and assured victim-investors that their funds were restricted and "could not be transferred to anyone other than the victim-investors." The present case does not contain any of these type of allegations and the activity under review here is not active participation in a scheme with affirmative statements by a bank to investors. The first factor weighs against imposing a duty.

The second factor is the public policy of encouraging participation in the activity, while weighing the safety of the participants. Imposing a duty of care on a bank to monitor customer accounts to ensure safekeeping of funds in a traditional banking relationship may discourage traditional services. For example, here, Plaintiff argues that TD Bank should have taken steps to shut down transfers made by an authorized person because these transfers violated Debtors' operating agreements. Requiring banks **[*19]** to review corporate governance documents, understand them, and ensure their customers do not violate them each time they go to the bank to handle their day to day business activities would substantially burden the relationship between banks and their customers. Many customers may also view this as an unwarranted intrusion into their business affairs. This factor weighs against imposing a duty.

The third factor is the avoidance of increased litigation. Recognizing a duty to monitor simple depository accounts, and/or to know a customers' constituent documents and monitor for compliance with those documents will lead to an increase in litigation. This is particularly so when, like here, transfers are made by an authorized person. Such a duty would pose a significant burden on a bank; it would also constitute an unwarranted intrusion into a customers' business for a simple depository account relationship.[43] Further, such a duty would undoubtedly lead to an increase of litigation as fraudulent schemes are invariably run through depository accounts. This factor also weighs against imposing a duty.

---

[39] *Frigon v. Enfield Sav. and Loan Ass'n, 195 Conn. 82, 486 A.2d 630, 633 (Conn. 1985)* (dismissing claim of negligence in paying funds to a customer's duly appointed agent); *See [*17] MJZ Corp. v. Gulfstream First Bank & Trust, N.A., 420 So.2d 396, 397 (Fla. Dist. Ct. App. 1982)* ("[T]the relationship between a bank and its depositing customer is contractual.").

[40] *2007 Conn. Super. LEXIS 1838, 2007 WL 2241755 (Conn Superior Ct. July 11, 2007)*. I should note that Marino addresses an allegation of a fiduciary duty between a bank and its customer as opposed to a claim of negligence.

[41] *St. Bernard Sch. of Montville, Inc. v. Bank of Am., 312 Conn. 811, 95 A.3d 1063, 1075 (Conn. 2014)* (while the trial court apparently entered a judgment based on negligence, as well as breach of contract and violations of Article 3 of the Uniform Commercial Code, the negligence finding was not on appeal); *Michael J. Fitzgerald Contr. Co. v. People's Bank, 2002 Conn. Super. LEXIS 251, 2002 WL 241303 (Conn. Super. Jan 30, 2002)* (unauthorized withdrawal from checking account).

[42] *Coquina Invs. v. Rothstein, No. 10-60786-CIV, 2011 U.S. Dist. LEXIS 7062, 2011 WL 197241, at *1 (S.D. Fla. Jan. 20, 2011)*.

---

[43] Compare *Freeman v. Dean Witter Reynolds, Inc., 865 So.2d 543, 549 (Fla. 2d DCA 2003)* (concluding in the context of a claim for breach of fiduciary duty: "[w]e would radically alter the law of banking if we required banks to review credit card accounts and checking accounts to make certain that their customers were spending their money wisely.").

The fourth factor looks to decisions from other jurisdictions. Other jurisdictions appear to uniformly [*20] hold that banks do not have a duty of care to monitor their customer's accounts or to investigate suspicious activity. For example, in *Wiand v. Wells Fargo Bank*, N.A.[44] a court appointed receiver for multiple hedge funds sued Wells Fargo for negligence in connection with a Ponzi scheme perpetrated by the hedge funds' manager. Two of the hedge funds were Wells Fargo customers. Additionally, Wells Fargo invested in two of the hedge funds, and loaned money to the manager after conducting due diligence. The receiver alleged that the manager frequently transferred large sums of money between accounts that triggered fraud alerts and generated reports in the bank's record-keeping system, and that the bank failed to follow its own internal procedures concerning money laundering as well as federal regulations. While the Florida standard for negligence is not exactly the same as Connecticut's, Florida courts recognize duties arising from statutes and regulations, judicial decisions and duties arising from the facts of a particular case. Florida courts also recognize a duty of care arises from "a foreseeable zone of risk arising from the acts of the defendant."[45] After examining all possible sources [*21] of a duty, the district court dismissed the negligence count concluding that Florida law does not impose a duty on a bank to investigate transactions made by authorized agents of an account holder.[46] It also concluded that violations of federal banking laws and regulations may be evidence of negligence, but cannot provide a duty of care.[47] Courts from other states concur.[48] This factor weighs against imposing a duty.

---

[44] *Wiand v. Wells Fargo Bank, N.A., 86 F. Supp. 3d 1316, 1322 (M.D. Fla. 2015)*.

[45] *Id. at 1323*.

[46] *Id. at 1322* citing *Lamm v. State Street Bank and Trust, 749 F.3d 938, 948 n.7*.

[47] The Court also noted that to the extent federal regulations impose duties on banks, the duties run to the United States, not the bank's customers. *Id. at 1322*.

[48] *Go-Best Assets, Ltd. v. Citizens Bank, 463 Mass. 50, 54, 972 N.E.2d 426 (2012)* ("A bank generally does not have a duty to investigate or inquire into the withdrawal of deposited funds by a person authorized to draw on the account to ensure that the funds are not being misappropriated."); *2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corporation, 503 F. App'x 51, 53-54 (2d Cir. 2012)* (declining to find

Taking all facts in the Complaint as true and drawing all reasonable inferences in favor of Plaintiff, I conclude that Plaintiff has not adequately pled negligence. While the harm alleged by Plaintiff may have been foreseeable, public policy does not support imposing a duty of care on banks to undertake investigations into corporate affairs of their customers with depository accounts.[49]

### Count II: Aiding and Abetting Breach of Fiduciary Duty

Plaintiff also sues Defendant for aiding and abetting DiMenna's breach of fiduciary duty. Defendant moves to dismiss this cause of action on two grounds: (i) the Connecticut Supreme Court does not recognize a claim for aiding and abetting breach of fiduciary duty and (ii) Plaintiff has [*22] failed to plead the requisite elements of an aiding and abetting claim.

As to the first argument, Defendant is wrong. Defendant relies on a Connecticut trial court decision in *Capone v. Katz*[50] to advance its argument that a claim for aiding

---

Signature Bank negligent in setting up a trust account because "New York courts will not, 'as a matter of policy,' create a duty of care that essentially makes banks trustees of every trust with which they do business. . . . It is well settled that 'a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation."); *Lawrence v. Bank of America, N.A., 455 F. App'x 904, 907 (11th Cir. 2012)* ("finding that banks have the 'right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds'") (quoting *O'Halloran v. First Union Nat'l Bank of Fla., 350 F.3d 1197, 1205 (11th Cir. 2003)*; *In re Knox, 64 N.Y.2d 434, 438, 477 N.E.2d 448, 488 N.Y.S.2d 146 (Ct. of Appeals NY 1985)* ("A bank is not in the normal course required to conduct an investigation to protect funds from possible misappropriation by a fiduciary . . . ."); *Fort v. Suntrust Bank, 7:13-CV-1883-BHH, 2016 U.S. Dist. LEXIS 114511, 2016 WL 4492898, at *8 (D.S.C Aug. 26, 2016)* ("[T]here is no overarching duty between a bank and its customers.").

[49] To the extent Plaintiff seeks to recover on behalf of the investors, I am also skeptical that banks generally owe a duty to third parties (non-customers) under Connecticut law. *See Red Law Firm, LLC v. Webster Bank, No. CV126029913S, 2013 Conn. Super. LEXIS 1419, 2013 WL 3766829, at *3 (Conn. Super. Ct. June 25, 2013)*; Opening Br. 9 n.6.

[50] 2017 WL 6601681, at *8 (Conn. Super. Nov. 22, 2017) (citing *Flannery v. Singer Finance Co., 312 Conn. 286, 94*

Jacob Tyson

and abetting breach of fiduciary duty in Connecticut is not actionable. While *Capone* does appear to stand for that proposition, the Connecticut Supreme Court case it cites for that proposition, *Flannery v. Singer Finance Co.*,[51] does not. In *Flannery*, the Connecticut Supreme Court recognized that it had not yet decided whether the issue of aiding and abetting breach of fiduciary duty is a viable cause of action and declined to do so once again.[52] Accordingly, *Flannery* does not compel dismissal of Count II. Rather, as the trial and appellate courts in *Flannery* did, I will proceed as if Connecticut would recognize the cause of action.

HN5[↑] To establish a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege that: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides [*23] the assistance; and (3) the defendant must knowingly and substantially assist the principal violation."[53] Defendant does not dispute that the first element—breach of a fiduciary duty (by Mr. DiMenna)—has been met.

The parties disagree over the standard to be applied for the second and third elements. As for the second element, Defendant argues that Plaintiff must plead sufficient facts to infer *actual* knowledge of a violation by the aider and abettor and not "general awareness" as Plaintiff argues. Defendant relies on *Renner v. Chase Manhattan Bank, N.A.*[54] for this argument. The court in *Renner*, however, interpreted New York law not Connecticut law. Recent decisions interpreting HN6[↑] Connecticut law show that Connecticut uses a "general awareness" standard for the requisite knowledge of the

---

underlying breach of fiduciary duty.[55]

### Second Element: Generally Aware

HN7[↑] In order to show that an aider and abettor was generally aware that he was part of tortious activity, a plaintiff must show that defendant has either "actual knowledge of the underlying tort or [that he] act[s] with reckless indifference to the possibility that the underlying tort is occurring."[56]

Plaintiff summarizes the following allegations [*24] for the proposition that TD Bank "knew or acted recklessly indifferent to the fact that, *inter alia*, DiMenna had established a money laundering operation (Seaboard Consolidated) within [TD Bank] accounts that fraudulently siphoned funds form the properties in which they were invested":

- In order facilitate the improper commingling of funds from one Debtor to another, DiMenna transferred funds from one Seaboard Entity's account to another through Seaboard Consolidated, LLC ("Seaboard Consolidated"), an entity wholly-owned by DiMenna. Seaboard Consolidated had no operations and was nothing more than a conduit through which DiMenna moved money. Funds would be transferred from various Debtors to Seaboard Consolidated and then into the account for another Seaboard Entity that had the immediate cash need. Complaint ¶ 33.

- Upon information and belief, DiMenna caused tens of millions of dollars to flow through the Seaboard Consolidated account very quickly. DiMenna would make these transfers in order to satisfy tax obligations, pay for operating and construction costs, pay trade debts, pay debt service, and/or make preferred dividend payments to investors. Complaint ¶ 34.

- Seaboard Consolidated [*25] was simply used as a pass-through to accomplish the transfer of funds to entities in need of cash. Complaint ¶ 35.

- At the time of the commencement of the

---

*A.3d 553, 560 n.12 (Conn. 2014)).*

[51] *94 A.3d at 560 n.12.*

[52] *Id.* ("[T]he present case does not require us to decide whether aiding and abetting a breach of a fiduciary duty is a viable cause of action in Connecticut, and we decline to do so in dicta.").

[53] *Halo Tech Holdings, Inc. v. Cooper, 2008 U.S. Dist. LEXIS 24831, 2008 WL 877156, at *20 (D. Conn. Mar. 26, 2008)* (quoting *Efthimiou v. Smith, 268 Conn. 499, 505, 846 A.2d 222 (2004)).*

[54] *85 F. App'x 782 (2d Cir. 2004).*

---

[55] *See Carney v. Montes, 2014 U.S. Dist. LEXIS 21769, 2014 WL 671263 (D. Conn. 2014); Learning Care Group, Inc. v. Armetta, 2014 U.S. Dist. LEXIS 140132, 2014 WL 12650852 (D. Conn. 2014); Short v. Conn. Cmty. Bank, N.A., 2012 U.S. Dist. LEXIS 42617, 2012 WL 1057302 (D. Conn. 2012).*

[56] *Learning Care Group, Inc. v. Armetta, 2014 U.S. Dist. LEXIS 140132, 2014 WL 12650852 at *5 (D. Conn. 2014).*

Bankruptcy Case, virtually every Seaboard Entity had its primary bank account at TDB. Complaint ¶ 36.

• Upon information and belief; various Debtors frequently bounced checks or otherwise had insufficient funds in their accounts. Complaint ¶ 37.

• Upon information and belief, TDB was aware that Debtors were frequently transferring funds between and among each other. Accounts with a high volume of activity, which carry low balances, and are frequently overdrawn are a classic "red flag" for improper financial activity. Complaint ¶ 38.

• Upon information and belief, TDB permitted DiMenna to frequently transfer funds between Debtors' accounts to cover overdrafts, even though it was clear that each Debtor was an individual company. Complaint ¶ 39.

• Upon information and belief, TDB was also aware that once deposits were made, the funds were frequently remitted elsewhere, leaving only small amounts in the accounts, another "red flag" improper financial activity. Complaint ¶ 40.

• Upon information and belief, TDB was aware that Seaboard Consolidated **[*26]** did nothing other than pass money back and forth among debtor entities. Complaint ¶ 41.

• Upon information and belief, TDB knew or should have known of the above banking activity being conducted by Debtors but failed to take any steps to stop it. Complaint ¶ 58.

• Upon information and belief, but for TDB ignoring and condoning the above conduct, the financial fraud described above could not have occurred. DiMenna required a compliant bank, such as TDB, to perpetrate his activity. Upon information and belief, TDB provided the services DiMenna requested. Complaint ¶ 59.

Notwithstanding its characterization, Plaintiff does not truly assert that it has pled TD Bank had actual knowledge of DiMenna's breach of fiduciary duty. Plaintiff states that "TD Bank may very well have had actual knowledge of DiMenna's fraud. Sandlund was likely aware of DiMenna's conduct. Discovery is needed to ascertain the exact contours of TD Bank's knowledge."[57] This type of speculation does not meet the pleading standard for knowledge. Suspicion about an illegal activity or constructive knowledge is

insufficient to allege actual knowledge.[58]

The question, then, is whether these allegations meet the standard of reckless **[*27]** indifference. Plaintiff cites *Craig v. Driscoll*[59] for the proposition that recklessness "is a state of consciousness with reference to the consequences of one's acts. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them."[60] *Craig v. Driscoll* involved a bartender who continued to serve alcohol to an obviously intoxicated patron who intended to operate a motor vehicle. The Connecticut Supreme Court concluded that a complaint containing such allegations stated a claim for recklessness because such conduct "constitutes an extreme departure from ordinary care in a situation that involves a high degree of danger."[61]

Defendant cites to *Short v. Connecticut Community Bank* and *Stanley Ferber & Assoc. v. Northeast Bankcorp.*,[62] both of which discuss aiding and abetting liability in a commercial context.[63] *Short v. Connecticut Community Bank* is one of many cases involving the

---

[57] Answering Brief 16.

[58] *See Ryan v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 U.S. Dist. LEXIS 13750, 2000 WL 1375265, at *8-9 (E.D.N.Y. Sept. 20, 2000); In re Agape Lit., 773 F. Supp. 2d 298, 307-08 (E.D.N.Y. 2011).*

[59] *262 Conn. 312, 813 A.2d 1003 (Conn. 2003),* superseded by statute, *Conn. Gen. Stat. Ann § 30-102* (West), as recognized in *O'Dell v. Kozee, 307 Conn. 231, 265, 53 A.3d 178, 197 (2012)* ("Finally, we must acknowledge that, shortly after our decision in *Craig*, the legislature effectively overruled our holding in that case by expressly abrogating the common-law negligence action that this court had recognized.").

[60] *Id. at 1022.*

[61] *Id. at 1023.*

[62] *2012 U.S. Dist. Lexis 42617 (D. Conn. Mar. 28, 2012); 1993 Conn. Super. LEXIS 3028, 1993 WL 489334 (Conn. Super. Nov. 16, 1993)* (court grants defendant's motion to strike concluding that merger partner did not aid and abet target's board by agreeing to go forward with acquisition).

[63] Defendant also cites numerous cases which it describes as directly on point discussing aiding and abetting claims in the context of fraudulent schemes and bank defendants. Reply Brief 8-9. These cases do not apply Connecticut law.

Ponzi scheme perpetrated by Bernard Madoff. Two investors bilked [*28] by Madoff held custodial accounts at Westport Community Bank (a division of Connecticut Community Bank) and sued the bank for aiding and abetting Madoff's fraud. The bank entered into custodial agreements with plaintiffs that required the bank to act as custodians with respect to plaintiff's funds deposited in the account and to invest the funds in an omnibus account maintained at Bernard L. Madoff Investment Services, Inc. ("BLMIS") The agreement provided that the bank acted only in a ministerial role and was not responsible for the investment strategy of the account. The bank was required to provide statements reflecting the property it held as a custodian, and it earned fees based on the average assets held. The lawsuit centered around whether the bank had a contractual or common law duty to verify the information reported by BLMIS and contained in the reports the bank sent to plaintiffs. The court granted summary judgment on the aiding and abetting claim against the bank concluding that there was no evidence that the bank had the requisite knowledge or was recklessly indifferent to the possibility of fraud. The evidence included that the bank failed to audit or verify BLMIS' reported [*29] assets, the bank promulgated inaccurate reports and the bank did not become suspicious when BLMIS refused the bank electronic access to its account and would not permit contact with it or the plaintiffs.

Here, the allegations of TD Bank's actions, or lack thereof, do not rise to the level of reckless indifference. I cannot infer from the allegations "something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." Nor can I infer from the allegations that TD Bank's conduct was "an extreme departure from ordinary care." As discussed in connection with Plaintiff's allegations of negligence, a bank is under no duty to monitor its customer's depository accounts. Simply knowing that the investments were to be siloed is not enough to show recklessness even if one of many foreseeable consequences could be fraudulent activity. Accordingly, Plaintiff failed to allege that Defendant was generally aware of DiMenna's breach of fiduciary duty.

### Third Element: Substantial Assistance

Even if I am wrong in concluding that Plaintiff has not pled reckless indifference, Plaintiff must still meet the third element [*30] of an aiding and abetting breach of fiduciary duty claim: substantial assistance. *HN8*[⬆] To plead substantial assistance, a plaintiff must come forward with allegations that "the assistance provided by the alleged aider and abettor was a substantial factor in bringing about the violation."[64] Connecticut courts have recognized that "the mere inaction" or "continued participation in a transaction" on the part of the defendant does not constitute substantial assistance.[65] In other words, the defendant must take some affirmative steps to further the breach of fiduciary duty.[66] An exception to this rule is when the defendant itself owes a fiduciary duty to the plaintiff.[67]

Plaintiff makes the following allegations in the Complaint in support of its argument that Defendant provided substantial assistance to DiMenna:

(a) it was aware that accounts were regularly overdrawn, yet made no further inquiry concerning the reasons why, thereby fostering the opportunity for DiMenna to use Debtors to perpetrate the financial fraud described above,

(b) it provided time for DiMenna to cover bounced checks and overdrawn accounts without making farther inquiry, thereby affording DiMenna time [*31] to cover-up his misconduct,
(c) it allowed Debtors to maintain low balances relative to the amount of account activity without further inquiry,
(d) it allowed Debtors to rapidly receive and wire-out funds without further inquiry, thereby permitting

---

[64] *Brunette v. Bristol Sav. Bank, No. CV 92-0453957S, 1994 Conn. Super. LEXIS 2132, 1994 WL 468448, at *3 (Conn. Super. Aug. 22, 1994)* (citing *Mendelsohn v. Capital Underwriters, Inc., 490 F. Supp. 1069, 1084 (N.D. Cal. 1979)).*

[65] *Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294-95 (2d Cir. 2006);* *Halo Tech Holdings, Inc. v. Cooper, 2008 U.S. Dist. LEXIS 24831, 2008 WL 877156, at *21 (D. Conn. Mar. 26, 2008). Ryan v. Hunton & Williams, No. 99-CV-5938 (JG), 2000 U.S. Dist. LEXIS 13750, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000)* ("The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do not constitute substantial assistance.").

[66] *Lerner v. Fleet Bank, N.A., 459 F.3d at 294-95* ("Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'"); *Harris v. Wells, 1991 U.S. Dist. LEXIS 1994, 1991 WL 23535, at *3 (D. Conn. 1991).*

[67] *Lerner v. Fleet Bank, N.A., 459 F.3d at 294-95.*

DiMenna to shift funds between accounts of Debtors and cover-up the financial fraud described above,

(e) it allowed transfers between and/or among Debtors despite the purported separateness of their businesses, without further inquiry, thereby permitting DiMenna to shift funds among Debtors' accounts and cover-up the financial fraud described above, and

(f) it deviated from normal banking procedures and protocols established to detect and stop illegal and improper activities, thereby permitting DiMenna to cover-up the financial fraud described above.

Complaint ¶ 57. Defendant argues that the above allegations do not rise to the level that is required to show substantial assistance, and instead, they only show that Defendant provided routine professional services.

All of the allegations set forth above are passive in nature. TD Bank's action, or more accurately, its lack of action "provided time" and "allowed" DiMenna or Debtors to make improper **[*32]** transfers, and it "permitted" DiMenna to cover-up his fraud by not following banking procedures. At best, TD Bank's actions can be characterized as "mere inaction" or "continued participation" in a transaction, which does not amount to substantial assistance. Further, Plaintiff has not alleged that Defendant owed a fiduciary duty to Debtors that would have required Defendant to take action.[68] Thus, Plaintiff has failed to plead that Defendant provided substantial assistance to DiMenna.

### Count III: The CUTPA Claim

Finally, in Count III of the Complaint, Plaintiff alleges that Defendant violated CUTPA by allowing DiMenna, through Seaboard Consolidated, to perpetrate fraud using Debtors' bank accounts. Defendant moves to dismiss Plaintiff's CUTPA claim on two grounds: (i) Plaintiff's pleading of boilerplate elements of the CUTPA claim is insufficient to withstand a motion to dismiss and (ii) Plaintiff failed to plead an unfair or deceptive[69] violation of CUTPA.

*HN9*[⬆] CUTPA regulates unfair or deceptive acts or practices taking place in Connecticut.[70] *Section 42-110b* of Unfair Trade Practices Act provides that "(a) [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices **[*33]** in the conduct of any trade or commerce."[71] To plead a CUTPA claim, a plaintiff must allege: (1) ascertainable loss of money or property, (2) causation, and (3) an unfair method of competition or an unfair or deceptive act in the conduct of any trade or commerce.[72] Additionally, to survive a motion to dismiss, a plaintiff does not have to meet the heightened standard of *Fed. R. Civ. P. 9(b)*.[73]

At the hearing on the Motion to Dismiss, Plaintiff conceded that if the claim for aiding and abetting is dismissed, the CUTPA claim will equally fail. Given that I am dismissing Count II, the CUTPA claim does not warrant any further discussion.

### Leave to Amend

In the conclusion section of the Answering Brief, Plaintiff urges me to grant leave to amend the Complaint should I see fit to dismiss it. Plaintiff states that as a trust it was only recently formed when it filed the Complaint and was without sufficient time to cull through the thousands of pages of documents it inherited from Debtors.

*HN10*[⬆] Leave to amend is freely granted, "unless an amendment would be inequitable or futile.[74] Given

---

[68] *See Cumis Ins., Soc., Inc. Windsor Bank & Trust Co., 736 F. Supp. 1226, 1234-35 (1990)* (defendant's silence is insufficient to satisfy the "substantial assistance" prong in the absence of some special relationship that is fiduciary in nature).

[69] Plaintiff is not arguing a deceptive act under CUTPA.

[70] CUTPA "gives honest businessmen great protection in [fighting] deceptive or unscrupulous competitors . . . who by unfair methods of competition and deceptive advertising, etc. unlawfully divert trade away from law abiding businessmen. *In re Trilegiant Corp., 11 F. Supp. 3d 132, 142 (D. Conn. 2014)* (quoting 16 H.R. Proc., Pt. 14, 1973 Sess., p. 7323)).

[71] *Conn. Gen. Stat. § 42-110b(a). Boulevard Associates v. Sovereign Hotels, 72 F.3d 1029, 1038 (1995)*.

[72] *Smith v. Wells Fargo Bank, NA., 158 F. Supp. 3d 91, 100 (D. Conn. 2016)*.

[73] *See Omega Engineering, Inc. v. Eastman Kodak Co., 908 F. Supp. 1084, 1099 (D. Conn. 1995); Van Dorsten V. Provident Life and Acc. Ins. Co., 554 F. Supp. 2d 285, 288-89 (D. Conn. 2008)* (a formulaic recitations of the elements of a cause of action is not sufficient to survive a *Rule 12(b)(6)* motion to dismiss).

[74] *Phillips v. County of Allegheny, 515 F.3d 224, 236 (3d Cir.*

Plaintiff's circumstances, I do not find that curative amendments would be inequitable or necessarily futile. Thus, I will grant the request **[*34]** for leave to amend the Complaint. Plaintiff will have 30 days to file an amended complaint if it has learned facts sufficient to show a right to relief above the speculative level.[75]

### Conclusion

An order will enter.

Dated: November 25, 2019

/s/ Laurie Selber Silverstein

Laurie Selber Silverstein

United States Bankruptcy Judge

### ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

For the reasons set forth in the Memorandum of even date, it is hereby ORDERED that the Motion to Dismiss is **GRANTED**. Plaintiff shall have 30 days to file an amended Complaint.

Dated: November 25, 2019

/s/ Laurie Selber Silverstein

Laurie Selber Silverstein

United States Bankruptcy Judge

---

**End of Document**

---

2008) citing *Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir.2002)*.

[75] *Twombly 127 S. Ct. at 1965* citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) ("[T]he pleading must contain something more ... than a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.").

Jacob Tyson