THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FAES & COMPANY (LONDON) LIMITED, | ) ) ) | |
| *Plaintiff*, | ) ) | No. 22 CV 7121 |
| v. | ) ) ) ) | Judge Virginia M. Kendall |
| BLOCKWARE SOLUTIONS, LLC, | ) ) | |
| *Defendant.* | ) | |

**MEMORANDUM OPINION AND ORDER**

Faes & Company (London) Limited engages in "bitcoin mining," which is the process of applying computing power to solve complex problems and produce new bitcoins. Blockware Solutions, LLC sells and manages bitcoin mining systems. To boost revenue, Blockware sent Faes an email advertisement; Faes was interested, and the two parties negotiated a deal. Blockware sent Faes a "Services Agreement" and "Co-Location Agreement," the latter containing an arbitration clause. Faes signed the Services Agreement but not the Co-Location Agreement. The two parties then conducted business pursuant to both agreements. After a few months, Faes concluded that Blockware's product did not perform to expectations. Faes then sued Blockware for breach of contract, negligence, deceptive trade practices, and fraud. Blockware moves to dismiss for lack of subject-matter jurisdiction, improper venue because arbitration is required, and failure to state a claim. (Dkt. 19). For the following reasons, the motion is denied in part and—understood as a motion to compel arbitration—granted in part. (*Id.*)

1

**BACKGROUND**

Faes, a corporation registered in the United Kingdom, "engage[s] in the business of bitcoin 'mining.'" (Dkt. 1 at ¶¶ 7, 9). Bitcoin mining is the process of applying computing power to solve cryptographic problems and produce new bitcoins. (*Id.* at ¶ 9). Bitcoin mining is done on miners, which are specialized computer systems. (*Id.* at ¶ 10). Because mining is energy intensive, miners are typically located in places with low energy costs. (*Id.* at ¶ 12). The profitability of bitcoin mining depends on the price of energy, hosting fees, and the price of bitcoin on the market. (*Id.*) One of the most significant concerns for mining bitcoin is "uptime," the length of time that miners are operational. (*Id.* at ¶ 20).

Blockware, a Delaware limited liability company with its principal place of business in Illinois, sells and manages bitcoin mining systems. (*Id.* at ¶¶ 8, 11). Blockware procures miners for its customers and offers hosting plans. (*Id.* at ¶¶ 11, 13). Under its hosting plans, Blockware installs the miners at data centers and oversees their management and operation on behalf of its customers for a fixed monthly rate. (*Id.* at ¶ 13, 19). Blockware advertised on its website that it offered "timely setup of machines, reliable internet and power, industry-leading up-times." (*Id.* at ¶ 20).

On June 16, 2021, Blockware sent Faes an email advertisement for its miner hosting services. (*Id.* at ¶ 14). Faes submitted a form through Blockware's website to find a "collocation partner to work with" and "a site to house c. 150 Antminer machines." (*Id.* at Ex. C). Blockware responded one week later via email with a description of its services and fees, stating "I can have you online in December, and sell you 150 x S19j Pro 100T November batch for $9950 landed cost each with a 6.8c kWh hosting rate." (*Id.* at ¶ 15). It also informed Faes that the machines would be located at a facility in Pennsylvania. (*Id.* at Ex. C).

2

On October 15, 2021, after discussing costs and delivery dates, Blockware sent Faes a "Services Agreement" and "Co-Location Agreement." (*Id.* at Ex. C). The Services Agreement acknowledges, "After Client has remitted payment to Blockware for the full amount of the Invoice, Blockware will arrange for the purchase and delivery of the specified computer system(s) on behalf of Client at the soonest opportunity." (*Id.*) The Co-Location Agreement states that Blockware "will provide certain services, including but not limited to the installation, maintenance and operation of Mining Equipment, as well as electrical power and Internet." (Dkt. 20 at Ex. 1). The Co-Location Agreement also contains an arbitration provision, "Each Party agrees to submit any and all disputes concerning this Agreement, if not resolved between the parties, to binding arbitration . . ." (*Id.*).

Faes wanted to purchase 50 miners. (Dkt. 1 at ¶ 16). It requested an invoice be sent to "Faes & Company (London) Limited" at "Two Fitzroy Place, 8 Mortimer Street, London W1T 3JJ." (*Id.* at Ex. C). Faes also asked several questions about specific clauses in both Agreements. (*Id.*) It objected to one clause in the Co-Location Agreement, "clause 7.10," because of uncertainty over "what is intended by this clause, [as] we can't agree to this, if the intention is that we need to disclose all technology Developments of our firm to Blockware, and to make such Developments available for use by you." (*Id.*) On the same day, Blockware answered each of Faes's questions and responded to Faes's concern about clause 7.10 stating, "This is only related to Blockware – none of your personal IP." (*Id.*)

On October 19, 2021, Faes then agreed to purchase 50 miners at $10,500 per machine for delivery in January 2022. (*Id.* at ¶ 16, Ex. C). The next day, Blockware sent Faes an invoice for $525,000 for the 50 miners, which Faes timely paid. (Dkt. 1 at ¶ 16). Faes signed the Services

3

Agreement for the purchase and delivery of the miners. (*Id.* at ¶ 17). Faes did not, however, sign the Co-Location Agreement. (Dkt. 1 at ¶ 18).

Faes's miners went online on April 21, 2022. (*Id.* at ¶ 21). Faes paid monthly invoices to Blockware from May 2022 through October 2022. (Dkt. 20 at ¶ 11). Problems with the miners' uptimes allegedly began approximately two days after the machines went online. (Dkt. 1 at ¶ 23). As of October 2022, the average uptime for Faes's miners at Blockware's Pennsylvania facility was less than 70 percent. (*Id.* at ¶ 22). And although Blockware's website showed consistent 100 percent uptime at its Pennsylvania facility during September and October 2022, the website indicated that there were approximately 50 days of extended power "curtailment" at the facility during that timeframe. (*Id.* at ¶¶ 22, 24).

Faes notified Blockware that its machines were not performing as expected. (*Id.* at ¶ 26). After Blockware did not address Faes's concerns, Faes told Blockware, "We are meant to have 50 machines with Blockware but have now been months, with no more than 2.5PH and only for a few hours a day. We have only had 5PH a few weeks, since we ordered the machines a year ago. This isn't right." (*Id.*) Since approximately October 20, 2022, Faes's miners at Blockware's Pennsylvania facility have all been offline. (*Id.* at ¶ 27). After discussing the possibility of transferring the Pennsylvania miners to a data center in Kentucky that had reliable power, Blockware agreed to ship them to Faes. (*Id.*) Faes maintains that, as a result, it has suffered a continuous loss of $5,000 per month. (*Id.*)

Faes sued for breach of contract, negligence, deceptive trade practices, and fraud related to the parties' agreements for the purchase and oversight of the bitcoin miners. (*See generally* Dkt. 1). Blockware now moves to dismiss for lack of subject-matter jurisdiction, improper venue, and failure to state a claim. (Dkt. 19).

# DISCUSSION

I. **Subject Matter Jurisdiction**

    A. **Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of a complaint when courts lack subject-matter jurisdiction over the parties. Fed. R. Civ. P. 12(b)(1). Courts resolving Rule 12(b)(1) challenges employ the same "plausibility" standard used to evaluate Rule 12(b)(6) motions to dismiss. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). All well-pleaded facts alleged in the complaint are considered true, and all reasonable inferences are drawn in plaintiffs' favor. *Gociman v. Loyola Univ. Chi.*, 41 F.4th 873, 881 (7th Cir. 2022). "The party invoking [] jurisdiction ... bears the burden of showing its existence." *Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 634 (7th Cir. 2021). And in determining whether subject-matter jurisdiction exists, courts may look beyond the jurisdictional allegations of the complaint. *See CCC Info. Servs., Inc. v. Am. Salvage Pool Ass'n*, 230 F.3d 342, 346 (7th Cir. 2000).

    B. **Diversity Jurisdiction**

Faes brings its claims under 28 U.S.C. § 1332(a). (Dkt. 1 at ¶ 3). Diversity jurisdiction exists if the amount in controversy exceeds $75,000 and the suit is between citizens of two different states. 28 U.S.C. § 1332(a). Both requirements are met here. Faes is registered in the United Kingdom; Blockware is incorporated in Delaware and headquartered in Illinois; and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Dkt. 1 at ¶¶ 3, 7, 8).

Despite these assertions, Blockware contends that Faes failed to demonstrate that Faes & Company (London) Limited is a party to the agreements because it was referred to as "Faes & Co" in emails and in the Services Agreement; its invoices were paid by two American companies, "Faes & Co US CORP" and "Faes & Co Digital Mining, Inc.," owned by Christian Faes, the CEO of

Faes; and it has no record of doing business with Faes & Company (London) Limited. None of these points are persuasive. Faes has demonstrated that Faes & Co and Faes & Company (London) Limited are the same entity. *See, e.g., Goplin v. WeConnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018) (holding that a defendant corporation, "WeConnect," was not party to an agreement signed by an entity named "AEI" where the only evidence that the entities were the same was one sentence in an affidavit). Christian Faes identified himself to Blockware as a "London based Fintech entrepreneur" and repeatedly told Blockware during negotiations that he was working in London. (Dkt. 1 at Ex. A). He also signed the Services Agreement on behalf of "Faes & Co" while communicating with Blockware from a "faes.co" email—after telling Blockware to send the initial invoice to "Faes & Company (London) Limited" in an email sent from the same email address. (*See* Dkt 1 at ¶¶ 16, 17, Ex. A). And the two US-based entities did not exist when the agreements were negotiated or when the Services Agreement was signed. (Dkt. 25 at 6). Thus, Faes & Company (London) Limited, otherwise known as "Faes & Co," was a party to the agreement.

**II.    Arbitration**

    **A.  Rule 12(b)(3)**

Blockware seeks to dismiss the complaint for improper venue under Rule 12(b)(3) because the parties agreed to arbitrate all disputes. But the appropriate motion for that relief is a motion to compel arbitration. "Venue is primarily a 'matter of convenience of litigants and witnesses.'" *Auto. Mechs. Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007) (quoting *Firstar Bank, N.A. v. Fault*, 253 F.3d 982, 990 (7th Cir. 2001)). A motion to dismiss for improper venue suggests that venue is "wrong" or "improper," as outlined by 28 U.S.C. § 1391. *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 56 (2013). "When venue is challenged, the court must determine whether the case falls within

one of the three categories set out in § 1391(b)." *Id.* "Venue" should not, however, be confused with "forum." A party seeking to enforce a forum selection clause—which an arbitration agreement falls under—must employ a different procedural mechanism. *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 773 (7th Cir. 2014) ("An agreement to arbitrate is a type of forum selection clause."). For arbitration, that mechanism is a motion to compel under the Federal Arbitration Act. *See* 9 U.S.C. § 4 ("The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.").

Blockware missed this legal distinction, but its error is not fatal. The Seventh Circuit has repeatedly cautioned against hyper-technicality in evaluating motions. *See, e.g.*, *Smith v. Bd. of Dirs. Of Triad Mfg., Inc.*, 13 F.4th 613, 618 (7th Cir. 2022); *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 890 (7th Cir. 2020); *cf. Jackson*, 764 F.3d at 773. Ultimately, "it is the substance of a motion that counts, not its label." *Brickstructures*, 952 F.3d at 890. Nothing is gained by forcing Blockware to refile its motion under a different name. Therefore, this Court construes its motion as one to compel arbitration. (*See* Dkt. 19). As in other areas, the "plausibility" standard still governs; all reasonable inferences are drawn in favor of the nonmoving party. *Jackson*, 764 F.3d at 773.

### B. Merits

The Federal Arbitration Act "sweeps broadly, 'requir[ing] courts rigorously to enforce arbitration agreements according to their terms.'" *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800 (7th Cir. 2020) (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018)); *see also* 9 U.S.C. § 1 et seq. As such, a court compels arbitration when (1) there is a valid agreement to

arbitrate, (2) the claims fall within the scope of the agreement, and (3) the opposing party refused to arbitrate." *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 702 (7th Cir. 2022). The validity of an arbitration agreement is a matter of contract law.[1] *See First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943 (1995). Contract formation requires offer, acceptance, and consideration. *Zemke v. City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996).

Here, Blockware made an offer to Faes by emailing Faes a copy of the Co-Location Agreement containing an arbitration clause. *See Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 713 (7th Cir. 2019) (holding that emailing an agreement qualifies as an offer). The issue is whether Faes accepted the agreement without signing by availing itself of the services the Agreement provided for. (Dkt. 19 at 8). It did.

A party, through its acts and conduct, may indicate its assent to and be bound by a contract without signing it. *Bauer v. Qwest Commc'ns Co., LLC*, 743 F.3d 221, 227 (7th Cir. 2014) (citing *Landmark Props., Inc. v. Architects Int'l–Chi.*, 526 N.E.2d 603 (Ill. App. Ct. 1988)). Faes's actions indicate that it assented by acting pursuant to the Co-Location Agreement. *See Landmark Props.*, 526 N.E.2d at 605–06 (holding that the plaintiffs were bound to an unsigned contract, not an oral agreement, because the defendant sent the contract to define the services it performed, the plaintiffs never rejected the contract, and the plaintiffs communicated that it would pay for the services). Blockware provided Faes with a form copy of its Co-Location Agreement in response to Faes's request for Blockware's "Terms of Service." (Dkt. 1 at Ex. A). Faes asked about two clauses within the Agreement and stated it could not agree to one if it would require Faes to disclose its technology

---

[1] While the parties had agreed that Delaware law would govern any dispute, Blockware relied on Illinois law in its briefing, and Faes never objected. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011) ("Generally, the law applicable to a contract is that which the parties intended, assuming such an intent. When that intent is expressed, it should be followed.") (quoting *Hofeld v. Nationwide Life Ins. Co.*, 322 N.E.2d 454, 458 (Ill. 1975)). Practically speaking, there are no differences between the laws of the two states, so the Court will accept the parties' decision and apply Illinois law. *See id.* (applying Illinois law rather than Texas law based on parties agreement and lack of substantial difference between the states on the issue in question).

developments to Blockware. (*Id.*) But Faes never questioned the arbitration clause. (*Id.*) Blockware responded to Faes's questions and clarified that the clause Faes was concerned about only applied to Blockware's "IP." (*Id.*) Faes neither objected further to the Co-Location Agreement nor rejected it or any of the clauses. Most tellingly, after the miners were delivered to the Pennsylvania facility pursuant to the Services Agreement, Faes performed exactly under the terms of the Co-Location Agreement by paying the setup costs, requisite deposits, and monthly service fees stipulated. (Dkt. 19 at 5).

Moreover, an offeror may construe silence as acceptance if the circumstances, such as prior dealings or otherwise, make it reasonable to do so. *Gupta*, 934 F.3d at 713. Faes's silence after receiving the Co-Location Agreement and Blockware's responses to its questions constitutes acceptance.[2] Faes had a reasonable opportunity to reject the Co-Location Agreement or the arbitration clause contained therein because it received the Agreement, discussed it with Blockware prior to paying its first invoice, and then continued to use and pay for Blockware's services pursuant to the Agreement. Blockware reasonably construed Faes's silence as acceptance, especially considering that Faes had raised two issues with the Co-Location Agreement during negotiations but did not object to the clause it now complains of. *See Bauer*, 743 F.3d at 228 (holding that a party was bound by a written agreement containing an arbitration clause despite his failure to sign because the party had a demonstrated history of speaking up when he found something objectionable but did not object to the terms at issue).

---

[2] *See, e.g., Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002) (plaintiff's silence and inaction constituted acceptance of an arbitration clause in a service agreement where he had a reasonable opportunity to reject the offer, but continued to use the defendant's services that were offered with the explicit expectation of compensation); *Gupta*, 934 F.3d at 714 (the defendant reasonably construed the plaintiff's silence as acceptance of the arbitration agreement after he was given a clear offer, a reasonable opportunity to opt-out, and instructions that continued employment reflected acceptance).

Faes argues that it is not bound by the arbitration clause because it explicitly rejected the Co-Location Agreement. (Dkt. 25 at 9); *see also Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 927 (7th Cir. 1991) ("[A]ccepting an offer by requesting modification of the terms constitutes a rejection of the original offer and a counter-offer."). But Faes did not request any modification of the overarching deal or the arbitration term. Although Faes originally stated that it could not agree to the Agreement's "Clause 7.10" if it required Faes to disclose its technology developments, Blockware clarified the meaning of the clause, and Faes made no further objections or requests for modification. (Dkt. 1 at Ex. A). At no point did Faes ever reject the arbitration clause.

Accordingly, there is a valid arbitration agreement between the parties. The arbitration clause here is comprehensive: "any and all disputes concerning this Agreement" will be submitted to arbitration. (Dkt. 20 at Ex. 1). This dispute over Blockware's business performance easily falls under the broad clause.

## CONCLUSION

For the reasons above, Blockware's motion to dismiss for lack of subject-matter jurisdiction is denied; Blockware's motion to dismiss for improper venue is construed as a motion to compel arbitration and is granted. (Dkt. 19). The case is stayed pending arbitration. *See Continental Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 732 n.7 (7th Cir. 2005) ("We have noted that the proper course of action when a party seeks to invoke an arbitration clause is to *stay* the proceedings pending arbitration rather than to dismiss outright."). The parties shall notify the Court of the disposition of the arbitration. Blockware's motion to dismiss for failure to state a claim is dismissed as moot. (Dkt. 19).

_____
Virginia M. Kendall
United States District Judge

Date: May 31, 2023

11